2008-NMCA-033

179 P.3d 1248

**Susan BISHOP and Mark Skofield, as Class Representatives in their capacities as Personal Representatives of the Estate of Richard H. Skofield, Individually and in his capacity as Class Representative, Plaintiffs–Appellants/Cross–Appellees,**

v.

**The EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY, a foreign corporation d/b/a Manzano Del Sol Good Samaritan Village, Defendants–Appellees/Cross–Appellants.**

No. 25,510.

Court of Appeals of New Mexico.

Jan. 10, 2008.

Certiorari Granted, No. 30,899, Feb. 28, 2008.

Jeffries, Rugge, Rosales, PC, Eric Sedillo Jeffries, Brian A. Thomas, Albuquerque, NM, for Appellants.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., Martha G. Brown, Albuquerque, NM, Quarles & Brady LLP, Dan Conley, Paul D. Bauer, Milwaukee, WI, for Appellees.

## OPINION

ALARID, Judge.

{1} Plaintiffs' motion for rehearing having been granted, the Court's opinion of September 4, 2007, is withdrawn and this opinion substituted in its place.

{2} This appeal requires us to construe and apply the Continuing Care Act. The Legislature enacted the Continuing Care Act (CCA) in 1985. 1985 N.M. Laws, ch. 102 (codified at NMSA 1978, §§ 24–17–1 to –13 (1985, as amended through 2005)). In enacting the CCA, the Legislature declared that "continuing care communities are an important and growing alternative for the provision of long-term residential, social and health maintenance needs for the elderly; however, the [L]egislature also finds that severe consequences to residents may result when a provider becomes insolvent or unable to provide responsible care." Section 24–17–2(A). The Legislature stated that "[t]he purpose of the [CCA] is to provide for disclosure and the inclusion of certain information in continuing care contracts in order that residents may make informed decisions concern-

**642**

ing continuing care and to provide protection for residents and communities." Section 24–17–2(B) (citation omitted).[1]

{3} The CCA contains the following provision, which is of particular importance in the present case.

A continuing care contract shall ... state when fees will be subject to periodic increases and what the policy for increases will be; provided, however, that ... increases *shall be based upon economic necessity, the reasonable cost of operating the community, the cost of care and a reasonable return on investment* [.]

Section 24–17–5(B)(11) (emphasis added).

{4} Defendant, Evangelical Lutheran Good Samaritan Society (Good Samaritan), is a non-profit corporation, incorporated under North Dakota law, with its home office in South Dakota. Nationwide, Good Samaritan operates more than two hundred independent living and nursing home facilities serving senior citizens. Good Samaritan operates nine facilities in New Mexico, including Manzano del Sol Good Samaritan Village (Manzano), an independent living facility located in Albuquerque.

{5} Plaintiff and Class Representative, Richard H. Skofield (Skofield), resided at Manzano.[2] The class consists of Skofield and approximately three hundred residents of Manzano who were subject to fee increases between July 30, 1993, and July 30, 1999.[3] Skofield and other class members were parties to Entrance Agreements with Manzano containing the following provision tracking the requirements of Section 24–17–5(B)(11).

The monthly service fee may be subject to increases provided, however, that MANZANO shall give advance notice of not less than thirty (30) days to the RESIDENT before any increase in monthly service fee becomes effective and *increases shall be*

based upon economic necessity, the reasonable cost of operating MANZANO, the cost of care and reasonable return on investment.

There is no dispute that the Entrance Agreements are "continuing care contracts" governed by the CCA.

**DISCUSSION**

{6} The district court found that Good Samaritan raised the monthly service fee that Manzano charged residents 2.5% in 1994, 6% in 1995, 3% in 1996, 4% in 1997, and 2% in 1998; and that "[i]n raising the fees, [Good Samaritan] did not consider whether the increases complied with the CCA. Specifically, prior to each increase, [Good Samaritan] did not determine if the increase was based upon economic necessity or a reasonable return on investment." These findings are not challenged on appeal. The district court concluded that "[Good Samaritan] breached its contract with the class members by failing to conduct the required statutory analysis under the [CCA] and the continuing care contracts." Based on its determinations that Good Samaritan had violated the CCA and breached its contracts, the district court awarded substantial damages to the class. Good Samaritan challenges the judgment, arguing that its increases were lawful under any reasonable interpretation of the CCA. We agree with Good Samaritan that the damages awarded by the district court cannot be sustained under the legal theories reflected in the district court's findings of fact and conclusions of law. Accordingly, we reverse the judgment of the district court and remand for entry of a judgment in Good Samaritan's favor.

{7} The terms "economic necessity" and "reasonable return on investment" are not defined by the CCA and there were no regulations[4] in place defining these terms at the

1. For a general discussion of the origin and nature of continuing care facilities and the concerns that led to the widespread governmental regulation of such facilities, *see generally* Michael D. Floyd, *Should Government Regulate the Financial Management of Continuing Care Retirement Communities*, 1 Elder L.J. 29, 35–52 (1993).

2. Richard Skofield died while this case was pending in the district court; Susan Bishop and Mark Skofield, the Personal Representatives of his estate, have been substituted in his stead.

3. Out of approximately 324 potential class members, 111 still lived at Manzano when this case was brought. Fifty-nine class members receiving actual notice elected to opt-out.

4. In January 2006, after the district court entered judgment in the present case, the Aging and Long–Term Care Service Department promulgated rules defining the four statutory factors. NMAC, Title 9, Ch. 2, Part 24.

times Good Samaritan imposed the fee increases that are the subject of this litigation. Our opinion in this case appears to be the first appellate opinion interpreting the CCA.

▮ {8} We begin our analysis with the fourth factor, reasonable return on investment, as this factor was the focus of the parties' dispute in the district court.[5] Plaintiffs argue that for purposes of Section 24–17–5(B)(11), return on investment refers to a ratio commonly used by accountants and financial advisors in evaluating a business. *See generally* Daniel Lipsky & David A. Lipton, *A Student's Guide to Accounting for Lawyers* 192–200 (Matthew Bender 1985) (discussing "profitability ratios," including rate of return on investment). Plaintiffs asserted that a return on investment can be calculated for any business, including non-profit entities; and, that by comparison with the returns historically achieved by for-profit business enterprises, Good Samaritan's return on its investment in Manzano, including the return on Manzano's reserves which Good Samaritan had invested in the stock market, were excessive. In contrast, Good Samaritan argues that we should interpret reasonable return on investment by analogy to public utility rate-making, an area of the law where the concept of a reasonable return is well established. Good Samaritan argued that reasonable return as used in rate-making has no application to non-profit entities such as Good Samaritan. The parties' dispute over the meaning of "reasonable return on investment" presents us with an issue of statutory construction, "a legal question which we review de novo." *HSBC Bank USA v. Fenton,* 2005–NMCA–138, ¶ 5, 138 N.M. 665, 125 P.3d 644.

▮ {9} We see an obvious analogy between rate-making and the analysis contemplated by Section 24–17–5(B)(11). *See Fed. Power Comm'n v. Hope Natural Gas Co.,* 320 U.S. 591, 601, 64 S.Ct. 281, 88 L.Ed. 333 (1944) (observing that "[r]ate-making is indeed but one species of price-fixing"). In each case, the Legislature has substituted a legislatively prescribed method for setting prices in place of the market forces that

otherwise would determine the prices a business may charge consumers. In the rate-making context, reasonable return has constitutional implications: due process of law requires that rates be set high enough to allow investors the opportunity to recover a return on their investment over and above the enterprise's costs of operation. *In re Rates & Charges of Mountain States Tel. & Tel. Co.,* 99 N.M. 1, 8, 653 P.2d 501, 508 (1982). An opportunity for investors to earn a reasonable return on investment is a mandatory requirement in a governmentally imposed rate-making or price-control regime. *See Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 258 Cal.Rptr. 161, 771 P.2d 1247, 1252 (1989) (In Bank). If the CCA did not allow investors in continuing care communities to recover a reasonable return on investment, we would be presented with a substantial question as to whether the limitations on fee increases imposed by Section 24–17–5(B)(11) are confiscatory. *Cf. Mich. Bell Tel. Co. v. Engler,* 257 F.3d 587, 594–95, 600 (6th Cir.2001) (enjoining the State of Michigan from enforcing provisions of the Michigan Telecommunications Act freezing rates and abolishing intrastate end user common line charge; emphasizing the legislature's failure to provide for a constitutionally adequate rate of return over and above the costs of providing services); *Prop. Owners Ass'n of N. Bergen v. Twp. of N. Bergen,* 74 N.J. 327, 378 A.2d 25, 29 (N.J.1977) (invalidating ordinance controlling rents charged to elderly tenants; citing the principle that rent regulation must allow landlords "a just and reasonable return" (internal quotation marks and citation omitted)). By expressly authorizing the owners and operators of continuing care communities to recover a reasonable return on investment, our Legislature anticipated and foreclosed concerns that the CCA would be construed as confiscatory. "Although we rest our decision in this case on our interpretation of the statutory language, not constitutional doctrine, it is appropriate for a court interpreting a statute to consider whether a particular interpretation is likely to create

---

5. Plaintiffs represented to the district court in their opening statement at trial that "[a]t the center of this case is the definition of 'reasonable return on investment.' There are three other

factors that will be discussed in the course of this trial. But the reasonable return on investment is the reason why we are in litigation. Otherwise, we could have resolved this."

[or avoid] problems arising from constitutional doctrine." *Hughes v. Timberon Water & Sanitation Dist.*, 1999–NMCA–136, ¶ 10, 128 N.M. 186, 991 P.2d 16. We conclude that the Legislature intended "reasonable rate of return" to refer to a constitutionally adequate rate of return rather than to prescribe a particular accounting ratio.

{10} Price controls reflect the tension between the interests of investors in an enterprise subject to price controls and the interests of consumers of the enterprise's goods or services. *See In re Petition of PNM Gas Servs.*, 2000–NMSC–012, ¶¶ 7–8, 129 N.M. 1, 1 P.3d 383. The requirement of a return on investment reflects the concern that investors will withdraw their capital or decline to invest in regulated industries if they are denied a return on their investment. *See* Richard J. Pierce, Jr. & Ernest Gellhorn, *Regulated Industries in a Nutshell* 99 (4th ed.1999); *see also Valley View Cmty. Hosp. v. United States*, 230 Ct.Cl. 581, 584, 679 F.2d 857 (1982) (discussing how differences in the sources of capital for nonprofit and proprietary providers justify denying non-profit Medicare providers a reimbursement for return on equity). However, non-profit corporations like Good Samaritan do not depend on shareholder-investors who contribute funds with the expectation of receiving a return on their investment. *See Sekan Elec. Coop. Ass'n v. State Corp. Comm'n*, 4 Kan. App.2d 477, 609 P.2d 188, 191 (1980) (noting the "fundamental difference" between cooperative and for-profit utilities; observing that a return large enough to pay dividends in order to attract capital is not required in the case of cooperative utilities). Mission fulfillment, not profitability, is the measure of success of a non-profit organization. Peggy Sasso, Comment, *Searching for Trust in the Not–for–Profit Boardroom: Looking Beyond the Duty of Obedience to Ensure Accountability*, 50 UCLA L.Rev. 1485, 1528 (2003) (suggesting that "mission fulfillment" by a non-profit entity is roughly equivalent to "enhancing shareholder value" in the for-profit sector); *see generally* Malvern J. Gross, Jr., Richard F. Larkin & John H. McCarthy, *Financial and Accounting Guide for Not–for–Profit Organizations* § 2.1 (John Wiley & Sons, Inc., 6th ed.2000) (discussing how difference in goals of commercial and not-for-

profit organizations affect accounting methods). The difference in the basic goals of for-profit and non-profit organizations is reflected in different standards for determining whether governmental regulation has resulted in a taking of the property of for-profit organizations versus charitable or non-profit organizations. *Soc'y for Ethical Culture in the City of N.Y. v. Spatt*, 68 A.D.2d 112, 416 N.Y.S.2d 246, 251 (1979) (contrasting tests for determining whether governmental restrictions on the use of private property have accomplished a taking; observing that the criterion for commercial property is whether the regulation "prevents the owner from obtaining an adequate return," while the comparable test for private property used by a tax-exempt charitable organization is whether the regulation "prevents or seriously interferes with carrying out the charitable purpose").

{11} When a non-profit corporation generates a surplus, it is prohibited by law from declaring dividends or otherwise distributing the surplus to members, directors, or officers. *E.g.*, NMSA 1978, § 53–8–28(A) (1989); *see generally* Howard L. Oleck & Martha E. Stewart, *Nonprofit Corporations, Organizations, & Associations* § 3 (Prentice Hall, 6th ed.1994). "[T]he key to nonprofit status is that '[n]et earnings, if any, must be retained and devoted in their entirety to financing further production of the services that the organization was formed to provide.'" Rob Atkinson, *Altruism in Nonprofit Organizations*, 31 B.C. L.Rev. 501, 513 (May 1990) (quoting Henry B. Hansmann, *The Role of Nonprofit Enterprise*, 89 Yale L.J. 835, 838 (1980)). "Non-profit organizations are not barred from making a 'profit' or 'surplus'; they are only restricted in the ways in which they use their profits (that is, they cannot distribute 'profits' to owners or shareholders)." *Wis. Hosp. Ass'n v. Reivitz*, 733 F.2d 1226, 1234 n. 5 (7th Cir.1984) (noting the advantage conferred on non-profit entities, whose management need not directly consider investors' expectation of a return on investment). The concern that motivates the inquiry into the reasonableness of a regulated enterprises's return on investment—the tension between the interests of investors in the enterprise and the interests of consumers of the enterprise's goods or services—simply

is not present in the case of non-profit provider such as Good Samaritan. As Good Samaritan pointed out in the district court, "Good Samaritan has no stockholders, pays no dividends, and ... its excess income is retained in reserve funds held for the exclusive benefit of residents. Nothing is 'returned' to anyone; there are no 'investors' who are getting rich from the monthly fees paid by Manzano's apartment residents." Plaintiffs' interpretation of reasonable return on investment would allow Good Samaritan to increase rates for the purpose of recovering a reasonable return on investment even though Good Samaritan has no shareholders and even though Good Samaritan is prohibited by law from distributing profits. We agree with Good Samaritan that the Legislature could not have intended a reasonable return on investment to be a material consideration for non-profit providers. Accordingly, we hold that the district court erred by construing the CCA to require non-profit providers such as Good Samaritan to base fee increases on a reasonable return on investment.

{12} Plaintiffs argue in their motion for rehearing that even if the CCA itself did not require Good Samaritan to consider a reasonable return on investment, each Entrance Agreement contains a contractual provision requiring Good Samaritan to base increases on four factors set out in the CCA. Therefore, according to Plaintiffs, even if Good Samaritan did not violate the CCA as we have construed it, it violated its contracts with Plaintiffs when it failed to consider a reasonable return on investment. This argument is disposed of by the principle that when a statute requires contracts of a particular class to contain provisions specified by the legislature, contractual provisions tracking mandatory statutory language "must be interpreted and given effect in accordance with the intention of the legislature, regardless of what the contracting parties may have understood it to mean." 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.26 at 278 (Rev. ed.1998). Good Samaritan's contractual obligations under statutorily mandated provisions of its Entrance Agreements are identical to its obligations under the CCA itself as we have construed it. If Good Samaritan did not violate the CCA by not basing increases on a reasonable return on investment, then it likewise did not violate the statutorily mandated provisions of its Entrance Agreements by not basing increases on a reasonable return on investment.

■ {13} Plaintiffs argue in their motion for rehearing that even if we conclude that Good Samaritan did not violate the CCA or breach its contracts by not basing increases on a reasonable rate of return, we nevertheless can sustain the judgment of the district court based on the district court's finding that Good Samaritan did not base its increases on economic necessity. The problem we have with this argument is that Plaintiffs did not develop in the district court an economic necessity theory of liability and damages that was analytically independent of Plaintiffs' claim that Good Samaritan's annual returns on investment were unreasonably high. Plaintiffs's failure to develop a separate economic necessity theory of liability and damages is reflected in absence of the requisite findings by the district linking Good Samaritan's failure to consider this factor to damages suffered by the class. A finding of breach of a statutory or contractual duty does not of itself entitle a plaintiff to damages. *Spencer v. Gamboa,* 102 N.M. 692, 694, 699 P.2d 623, 625 (Ct.App.1985) (holding that defendant's violation of a statute must be shown to have been a proximate cause of plaintiff's damages before liability can be imposed for a violation of a statute); III E. Allan Farnsworth, *Farnsworth on Contracts* § 12.1 at 150 (3d ed.2004) (observing that "[t]here is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss").

**CONCLUSION**

{14} We reverse the judgment of the district court and remand this case for entry of a judgment in favor of Good Samaritan.

{15} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and CELIA FOY CASTILLO, Judge.