## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2009-NMSC-036

Filing Date: June 23, 2009

Docket No. 30,899

SUSAN BISHOP and MARK SKOFIELD, as
Class Representatives in their capacities as
Personal Representatives of the Estate of
RICHARD H. SKOFIELD,

       Plaintiffs-Petitioners and
       Cross-Respondents,

v.

EVANGELICAL GOOD SAMARITAN SOCIETY,
a foreign corporation, d/b/a MANZANO DEL SOL
GOOD SAMARITAN VILLAGE,

       Defendant-Respondent and
       Cross-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
Wendy York, District Judge
Linda M. Vanzi, District Judge

Eric Sedillo Jeffries, L.L.C.
Eric Sedillo Jeffries
Albuquerque, NM

Law Offices of Brian A. Thomas, P.C.
Brian A. Thomas
Albuquerque, NM

for Petitioners and Cross-Respondents

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Martha Brown
Albuquerque, NM

Quarles & Brady, L.L.P.

Daniel E. Conley
Milwaukee, WI

for Respondent-Cross Petitioner

**OPINION**

**BOSSON, Justice.**

**{1}** This appeal arises from a class action lawsuit contesting fee increases at Manzano Del Sol Good Samaritan Village (Manzano), an independent living facility for senior citizens. Evangelical Good Samaritan Society (Good Samaritan), Defendant in this class action, is a nonprofit corporation that owns and operates more than two hundred independent living facilities nationwide, including the Manzano facility in Albuquerque. Plaintiffs' lawsuit alleged that from July 30, 1993 to July 30, 1999, Good Samaritan imposed rate increases on residents at Manzano in violation of the standards set forth in their contracts (Entrance Agreements) and in the Continuing Care Act, NMSA 1978, §§ 24-17-1 to -18 (1985, as amended through 2005). This is our first occasion to consider the provisions of the Continuing Care Act. For the reasons stated below, we agree with Plaintiffs and reverse the Court of Appeals.

**BACKGROUND**

**{2}** All retirement communities in New Mexico that undertake to provide "independent living and health or health-related services," § 24-17-3(C), for a fee, are subject to the Continuing Care Act. *See* §§ 24-17-2 to -3. The Continuing Care Act was designed to "provide for disclosure and the inclusion of certain information in continuing care contracts in order that residents may make informed decisions concerning continuing care and to provide protection for residents and communities." Section 24-17-2(B). Toward that end, the Continuing Care Act mandates that certain information must be disclosed in all contracts between continuing care facilities and their residents. *See id.* At issue in this case is the legislative requirement that all continuing care contracts "state when fees will be subject to periodic increases and what the policy for increases will be; provided, however, that . . . increases *shall* be based upon economic necessity, the reasonable cost of operating the community, the cost of care *and* a reasonable return on investment." Section 24-17-5(B)(11) (emphasis added).

**{3}** The contractual language in the Manzano Entrance Agreement for prospective residents governing initial monthly rent and future annual increases mirrors the language in Section 24-17-5(B)(11) of the Continuing Care Act. It states:

> The monthly service fee may be subject to increases provided, however, that MANZANO shall give advance notice of not less than thirty (30) days to the RESIDENT before any increase in monthly service fee becomes effective

2

and *increases shall be based upon economic necessity, the reasonable cost of operating MANZANO, the cost of care and reasonable return on investment*.

**{4}**    Good Samaritan raised its fee for Manzano residents 2.5% in 1994, 6% in 1995, 3% in 1996, 4% in 1997, and 2% in 1998.  Good Samaritan did not impose a rate increase in 1999.  As a result, Plaintiffs allege that Manzano generated significant profits throughout these years.  More importantly, Plaintiffs argue that Good Samaritan failed to apply two of the four factors required by both the Continuing Care Act and the Entrance Agreements when evaluating the need for annual rate increases.  Significantly for this case, several witnesses admitted that Good Samaritan never considered the fourth factor— reasonable return on investment—before imposing each increase.

**{5}**    Based on the evidence submitted at trial, the district court found that the rate-setting practices utilized by Good Samaritan at its Manzano facility violated the Continuing Care Act and breached the terms of the Entrance Agreements.  The district court stated that "[i]n raising fees, [Good Samaritan] did not consider whether the increases complied with the [Continuing Care Act]. Specifically, prior to each increase, [Good Samaritan] did not determine if the increase was based upon economic necessity or a reasonable return on investment."  As a result, the district court concluded that Good Samaritan "obtained an unreasonably high rate of return on its investment in Manzano del Sol, given [its] particular financial picture . . . ."  The district court found Good Samaritan liable to Plaintiffs' class for violating the Continuing Care Act and for breach of the Entrance Agreements, and awarded damages to the class in the amount of $154,415.

**{6}**    The Court of Appeals reversed that judgment, holding that nonprofit continuing care facilities were not required to consider reasonable return on investment when calculating rate increases. *Bishop v. Evangelical Lutheran Good Samaritan Soc'y*, 2008-NMCA-033, ¶ 11, 143 N.M. 640, 179 P.3d 1248.  That Court agreed with Good Samaritan's position that the Legislature did not intend to require nonprofit organizations to consider reasonable return on investment in their rate-setting calculations because nonprofit organizations "do not depend on shareholder-investors who contribute funds with the expectation of receiving a return on their investment." *Id.* ¶ 10.  Likewise, the Court held that Good Samaritan did not violate its Entrance Agreements, and stated that "when a statute requires contracts of a particular class to contain provisions specified by the legislature, contractual provisions tracking mandatory statutory language 'must be interpreted and given effect in accordance with the intention of the legislature, regardless of what the contracting parties may have understood it to mean.'" *Id.* ¶ 12 (quoting 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.26, at 278 (Rev. ed. 1998)).  The Court concluded that "[i]f Good Samaritan did not violate the [Continuing Care Act] by not basing increases on a reasonable return on investment, then it likewise did not violate the statutorily mandated provisions of its Entrance Agreements by not basing increases on a reasonable return on investment." *Id.*

**{7}**    In their petition for certiorari, Plaintiffs contend that the Court of Appeals misread

3

the Continuing Care Act and the intent of the Legislature. Good Samaritan cross-petitioned, arguing that if the reasonable return on investment language does apply to nonprofit facilities, then the Act is unconstitutionally vague.

## DISCUSSION

### Statutory Interpretation of the Continuing Care Act

**{8}** The Court of Appeals correctly indicated that the parties' dispute presents an issue of statutory construction. *Id.* ¶ 8. "The meaning of language used in a statute is a question of law that we review de novo." *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61. Because the parties advocate different approaches to statutory interpretation, we briefly address the role of appellate courts when construing a statute before deciding the issue.

**{9}** Plaintiffs argue that the plain language of Section 24-17-5(B)(11), "[fee] increases shall be based upon economic necessity, the reasonable cost of operating the community, the cost of care and a reasonable return on investment," is clear and unambiguous, thereby eliminating the need for a more substantiative appellate review. *See State ex rel. Helman v. Gallegos,* 117 N.M. 346, 347, 871 P.2d 1352, 1353 (1994) (stating where a statute is free from ambiguity, there is no room for construction). Good Samaritan, on the other hand, argues that the language in Section 24-17-5(B)(11) is ambiguous, particularly as applied to nonprofit continuing care facilities, and that we must engage in a more complete contextual review. *See Gallegos,* 117 N.M. at 348, 871 P.2d at 1354 ("[W]here the language of the legislative act is doubtful or an adherence to the literal use of words would lead to injustice, absurdity or contradiction, the statute will be construed according to its obvious spirit or reason, even though this requires the rejection of words or the substitution of others." (Internal quotation marks and citation omitted.)).

**{10}** As Chief Justice Montgomery wrote in *Gallegos*,

> the two approaches, correctly understood, can be viewed as complementary, not contradictory. That is, if the meaning of a statute is truly clear—not vague, uncertain, ambiguous, or otherwise doubtful—it is of course the responsibility of the judiciary to apply the statute as written and not to second-guess the legislature's selection from among competing policies . . . .

117 N.M. at 352, 871 P.2d at 1358. But this Court also cautioned against an overly simplistic application of the plain-meaning rule, stating that "it is part of the essence of judicial responsibility to search for and effectuate the legislative intent—the purpose or object—underlying the statute. *Id.* at 353, 871 P.2d at 1359.

**{11}** Therefore, when presented with a question of statutory construction, we begin our analysis by examining the language utilized by the Legislature, as the text of the statute is

the primary indicator of legislative intent. *See State v. Rivera*, 2004-NMSC-001, ¶ 10, 134 N.M. 768, 82 P.3d 939; *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599. We also consider the statutory subsection in reference to the statute as a whole and read the several sections together so that all parts are given effect. *High Ridge Hinkle*, 1998-NMSC-050, ¶ 5. We must also consider the practical implications and the legislative purpose of a statute, and when the literal meaning of a statute would be absurd, unreasonable, or otherwise inappropriate in application, we go beyond the mere text of the statute. *See Rivera*, 2004-NMSC-001, ¶ 14.

**{12}** Turning now to the Continuing Care Act, we must determine whether Good Samaritan was required, pursuant to Section 24-17-5(B)(11), to consider reasonable return on investment when determining the need for fee increases at Manzano. On its face, Section 24-17-5(B)(11) addresses mandatory contractual language and does not purport to set rates or limit their increase. Good Samaritan argues that Section 24-17-5(B)(11) was not designed to prescribe mandatory accounting practices. However, it would be anomalous for the Legislature to require the inclusion of rate-setting criteria in the Entrance Agreements if it did not equally intend that continuing care facilities would apply those criteria when considering fee increases.

**{13}** Section 24-17-5(B)(11) states that "[fee] increases *shall* be based upon economic necessity, the reasonable cost of operating the community, the cost of care *and* a reasonable return on investment." (Emphasis added.) The Legislature's use of "shall" and "and" indicates its intent that all four factors must be considered. There is nothing in the text of Section 24-17-5(B)(11) to suggest that the Legislature intended to exempt nonprofit facilities from this calculus.[1]

**{14}** Despite this mandatory language, Good Samaritan argues that the Legislature did not intend nonprofit facilities to consider the fourth factor, reasonable return on investment. As the Court of Appeals correctly observed, "reasonable return . . . allows investors the opportunity to recover a return on their investment over and above the enterprise's costs of operation." *Bishop*, 2008-NMCA-033, ¶ 9. Good Samaritan argues that a reasonable return on investment has no meaningful application to nonprofit continuing care providers because nonprofit entities have no "shareholder-investors who contribute funds with the expectation

---

[1]Under the new regulations promulgated by the New Mexico Agency on Aging—the administrative body charged with enforcing the Continuing Care Act—consideration of all four factors is no longer mandatory. *See* 9.2.24.8(C) NMAC (1/31/06) ("A continuing care community shall base rate and fee increases on *one or more* of the following four factors, and no others: (1) economic necessity; (2) the reasonable cost of operating the continuing care community; (3) the cost of care; and (4) a reasonable return on investment." (Emphasis added.)). However, these regulations did not take effect until January 31, 2006, years after these Entrance Agreements were in effect. We limit our consideration to the language used by the Legislature and in effect at the time Plaintiffs' cause of action arose.

of receiving a return on their investment." *Id.* ¶ 10. The Court of Appeals agreed and concluded, despite the clear language of Section 24-17-5(B)(11), that "the Legislature could not have intended a reasonable return on investment to be a material consideration for non-profit providers." *Id.* ¶ 11.

{15}    In analyzing legislative intent, we do not confine our review to this one statutory section. The several provisions of a statute must be read together so that all parts are given effect. *High Ridge Hinkle*, 1998-NMSC-050, ¶ 5. Doing so, we observe that Good Samaritan's proposed construction is in direct conflict with the Legislature's unequivocal statement in Section 24-17-11(A) of the Act that "[t]he provisions of the Continuing Care Act [24-17-1 NMSA 1978] *apply equally to for-profit and nonprofit provider organizations* and shall be construed as the minimum requirements to be imposed upon *any* person offering or providing continuing care." (Emphasis added.) Regrettably, the Court of Appeals' opinion does not address this language in Section 24-17-11(A). The opinion fails to explain how the Legislature could have intended part of the Continuing Care Act *not* to apply to nonprofit providers, when elsewhere the Act makes clear that it *does* apply to nonprofit providers.

{16}    Section 24-17-11(A) is a clear expression of the Legislature's intent that no distinction be made between for-profit and nonprofit continuing care facilities. Moreover, this Section illustrates that the Legislature was aware that continuing care facilities are organized both as for-profit and nonprofit entities. In their brief to this Court, Plaintiffs assert that the majority of continuing care facilities are organized as nonprofit, perhaps owing to the substantial tax benefits afforded to that classification. If the Legislature had intended to create different standards for nonprofit facilities, it likely would have done so expressly. The absence of any express exception, particularly when coupled with the Legislature's statement that all facilities are required to follow the provisions of the Act in the same manner, weighs heavily in favor of Plaintiffs. Accordingly, a purely textual reading of the Act indicates that the Legislature intended nonprofit facilities to consider all four factors in Section 24-17-5(B)(11), including reasonable return on investment, before imposing any fee increases.

{17}    Even though the statutory language clearly does not create an exception for nonprofit facilities, we nevertheless consider, as suggested by *Gallegos*, whether our textual reading of the statute conforms to the broader legislative purpose expressed in the Act. The Act provides for transparency and full disclosure so that seniors can make informed decisions when selecting a continuing care facility. *See* § 24-17-2(B) ("The purpose of the Continuing Care Act [24-17-1 NMSA 1978] is to provide for disclosure and the inclusion of certain information in continuing care contracts in order that residents may make informed decisions concerning continuing care and to provide protection for residents and communities."). Transparency may be vital to those residents who have little or no negotiating power concerning the terms of their Entrance Agreements. Transparency about the costs of living at a facility helps inform elderly residents living on fixed incomes with regard to their long-term financial planning. The Act also promotes the long-term solvency of continuing care

6

facilities so that seniors will not have to relocate or find an alternative provider at this vulnerable time in their lives. *See id.* § 24-17-2(A) ("[T]he legislature also finds that severe consequences to residents may result when a provider becomes insolvent or unable to provide responsible care.").

**{18}** The rate-setting criteria outlined in Section 24-17-5(B)(11) furthers these legislative goals. Facilities are authorized to impose measured rate increases that protect their solvency, while residents are provided with advance notice of rate increases and the criteria necessary to justify them. Of the four criteria identified in Section 24-17-5(B)(11), reasonable return on investment protects both the facility and the resident. The standard asks providers to consider their overall financial picture and to seek increases when necessary to generate sufficient revenue to satisfy debts and maintain an adequate reserve fund, all in support of their long-term financial health. The facility may charge a fee large enough to recover more that just its costs, yet that fee must be also tested through the lens of reasonableness. This factor serves as a prudential restraint to limit increases that would result in unreasonably high returns; it prevents providers from taking unfair advantage of persons who are oftentimes captive consumers of their services. Accordingly, we hold that Good Samaritan had a statutory obligation to consider reasonable return on investment, unless it was impossible to do so, which we address in more detail below.

**Vagueness**

**{19}** Good Samaritan argues that even if it was required to consider reasonable return on investment in its rate-setting formula, it could not do so because the term is unconstitutionally vague. There is no standard accounting principle with which to calculate a reasonable return on investment, and no guidance from the Act or corresponding regulations on how to do so. Therefore, we must determine whether the Legislature's requirement that fee increases be based, in part, on a reasonable return on investment can be applied with any reasonable degree of certainty.

**{20}** A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language. *See State v. Fleming*, 2006-NMCA-149, ¶ 3, 140 N.M. 797, 149 P.3d 113; *Ortiz v. Taxation & Revenue Dep't*, 1998-NMCA-027, ¶ 5, 124 N.M. 677, 954 P.2d 109. In construing a regulation or statute, "this Court has a duty to affirm the legislation's validity and constitutionality if reasonably possible." *Old Abe Co. v. N.M. Mining Comm'n*, 121 N.M. 83, 96-97, 908 P.2d 776, 789-90 (Ct. App. 1995). A statute is only unconstitutional "if it is so vague that persons of common intelligence must guess at its meaning and would differ in its application." *City of Albuquerque v. Sanchez*, 113 N.M. 721, 727, 832 P.2d 412, 418 (Ct. App. 1992). However, "absolute or mathematical certainty is not required in the framing of a statute." *State ex rel. Bliss v. Dority*, 55 N.M. 12, 29, 225 P.2d 1007, 1017 (1950).

**{21}** We begin by noting that Good Samaritan was not held liable for using an incorrect

7

accounting formula to calculate a reasonable return on investment. To the contrary, Good Samaritan admitted that it never attempted to apply a reasonable return on investment standard prior to Plaintiffs' suit. During the class period, Good Samaritan determined the need for rate increases based on the costs and debts of the facility. It also considered how competitive the rates were at Manzano as compared to the rates at other facilities in the area—a factor not contemplated by the Act—and would use that information as a basis to adjust its rates. This sort of arbitrary rate-setting formula is exactly what the Act was designed to prevent.

**{22}** Good Samaritan states that return on investment is a mathematical calculation based on the ratio of income to investment over a defined period of time. However, the parties acknowledge that at least two methods can be used to calculate return on investment. Plaintiffs' expert, Bruce M. Malott, calculated return on investment using a "return on equity" formula, which, as the district court noted, is determined first by averaging the "beginning and ending equity for a given period, determining the net revenue for that period, and dividing the net revenue[2] by the average equity." Mr. Malott stated that return on investment can also be calculated using a "return on assets" formula, which is determined by dividing the net revenue by the *total* value of the facilities' assets, including long term debt rather than just the *equity* value of the assets. Using the sale of a home as an example to illustrate the difference between these approaches, Mr. Malott testified:

> [T]he home costs 100,000. Down payment is 10,000. Mortgage is 90,000. If a year to the day later I sell [the home] for 110,000 and my mortgage hasn't changed, . . . I have equity of 20,000. My return on equity is 100 percent because I put 10,000 in. I made 10,000, so it's 10,000 over 10,000 [or] 100 percent. My return on assets . . . is 10,000 over 100,000 [or 10 percent].

**{23}** Good Samaritan argues that both formulas are traditionally used to calculate a company's profits in relation to the amount of money invested in it by shareholders, and thereby to measure how well a *for-profit* company is managing the money invested in it. While we agree that a return on investment, by its own terms, is a phrase designed to apply to for-profit entities with shareholders, Good Samaritan does not argue that it was impossible or impracticable for nonprofit facilities to calculate reasonable rate of return using one of these two formulas. In fact, Good Samaritan presented accounting testimony closely approximating the return on equity at Manzano during the class period, illustrating that Good

---

[2]Mr. Malott testified that he included investment income and operating income when calculating net revenue. The district court found that it was important to consider investment income because failure to do so would create an inaccurate financial picture for two reasons: (1) because investment income acts as revenue available to Manzano and (2) because a practical interpretation of the phrase "reasonable return on investment" includes investment income.

Samaritan was presumptively capable of calculating these figures before the fact as well. Instead of arguing that it could not have complied, Good Samaritan takes the position that further guidance was needed from the Legislature or the Agency on Aging to clarify which assets and debts are to be considered, the period of time over which the return is to be measured, and what is "reasonable." Without more information, Good Samaritan contends that it could only guess at a formula, and had no way to determine whether it would be in compliance with the Act.[3]

**{24}** Good Samaritan's vagueness argument does not persuade us. It would have been less important which of the two formulas were selected had Good Samaritan made an effort to choose one. The fact that continuing care facilities had multiple options is significant, and much less problematic than if no formula existed at all. Good Samaritan cannot reasonably claim impossibility when it had a choice of at least two methods to comply and, in fact, it chose neither. The lack of precision in the Act, far from prejudicing Good Samaritan, liberated it from any unfair restrictions in complying with the statute. Nothing prevented Good Samaritan from more precisely defining reasonable return on investment in its Entrance Agreements, including what it considered "reasonable," so as to provide residents with notice of its rate-setting practices in compliance with the Act.

**Substantial Evidence**

**{25}** Having determined the criteria to be applied to rate increases, as well as the constitutionality of that application, it only remains for us to decide whether the judgment below was supported by substantial evidence. "Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it." *Herrera v. Roman Catholic Church*, 112 N.M. 717, 721, 819 P.2d 264, 268 (Ct. App. 1991).

---

[3]The 2006 regulations, promulgated after the district court entered a final judgment in this case, address rate and fee increases by continuing care communities. 9.2.24.7 to 15 NMAC (1/31/2006). Under the new regulations, the Agency indicated that consideration of reasonable return on investment is no longer mandatory, but may now be considered at the option of the facility. The regulations further define how to calculate reasonable return on investment in 9.2.24.13 NMAC and address all of the definitional problems cited by Good Samaritan and noted above. The Agency also stated that nonprofit facilities could continue to consider return on investment by using a ratio "that is statistically equivalent to the return on investment for a for-profit corporation." 9.2.24.7(L) NMAC.

The 2006 regulations will prevent the necessity of addressing this question again. But as the regulations were not in effect during the class period, we do not consider them further in this review, and they play no role in the outcome of this case, aside from providing an example that nonprofit facilities can consider a reasonable return on investment.

9

**{26}** As previously discussed, the evidence at trial established that Good Samaritan did not attempt to construe or apply the reasonable-return-on-investment factor before imposing rate increases. The district court heard testimony from several witnesses on how to calculate return on investment. Plaintiffs' expert calculated return on investment at the Manzano facility using the "return on equity" formula, which yielded the following percentages: 16.09% in 1993; 17.17% in 1994; 18.13% in 1995; 21.34% in 1996; 22.42% in 1997; 12.62% in 1998; and 10.18% in 1999. Good Samaritan's accountant testified that a "reasonable" return on equity would fall between twelve and fifteen percent. The district court adopted these figures in its findings and conclusions, and held that Good Samaritan "breached its contract with the class members by failing to conduct the required statutory analysis under the Continuing Care Act and the continuing care contracts and, as a result, earned rates of return in excess of even its own representatives' determination of what is reasonable." Substantial evidence supports the district court's findings and conclusions on this point.

**{27}** Good Samaritan argues on appeal that its rate increases were objectively reasonable, even if it did not consider reasonable return on investment, in light of the regulations promulgated by the Agency on Aging in 2006. Good Samaritan notes that the new regulations adopted by the Agency on Aging in 2006 use a "return on assets" formula. *See* § 9.2.24.7(L) NMAC. After the fact, Good Samaritan calculated its "return on assets" at Manzano as 3.9% in 1993; 4.86% in 1994; 6.26% in 1995; 8.24% in 1996; 9.86% in 1997; 6.90% in 1998; and 5.49% in 1999. To determine whether the return on investment is reasonable, the new regulations state that the return cannot be "consistently greater than six percentage points higher than the average secondary market interest rate on ninety-day United States treasury bills." *Id.* Good Samaritan states that its return on assets was always less than six percent higher than the prescribed treasury bill rates, and therefore, when viewing its rate increases in retrospect using this formula, its rate increases were always "reasonable."

**{28}** This argument is equally unpersuasive. The district court found that Good Samaritan "did not present an expert to testify that if it had conducted the analysis required under the Continuing Care Act, the analysis would have shown that the rates of return during the class period were reasonable." Good Samaritan's argument in essence asks us to reconsider the factual evidence presented at trial in light of subsequent regulations pertaining to rate-setting after January 31, 2006. We decline to do so on appeal, as "we will not reweigh the evidence nor substitute our judgment for that of the fact finder." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. For Good Samaritan to argue that it complied with its statutory and contractual obligations, it must have made some attempt to calculate reasonable return on investment *before* imposing rate increases.

**{29}** The record amply supports the district court's determination that Good Samaritan failed to comply with its statutory and contractual obligations. Substantial evidence exists to uphold the district court's determination that Good Samaritan violated the Continuing

Care Act and the terms of its Entrance Agreements by imposing rate increases without considering reasonable return on investment. We reverse the Court of Appeals and uphold the judgment of the district court.

**CONCLUSION**

**{30}** We reverse and remand to the Court of Appeals to determine the remaining issues raised before that Court on appeal and cross-appeal.

**{31}** **IT IS SO ORDERED.**

 

_____

**RICHARD C. BOSSON, Justice**

**WE CONCUR:**

_____

**EDWARD L. CHÁVEZ, Chief Justice**

_____

**PATRICIO M. SERNA, Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**CHARLES W. DANIELS, Justice**

**Topic Index for _Bishop v. Evangelical Good Samaritan Society,_ No. 30,899**

| | |
|---|---|
| **CT** | **Constitutional Law** |
| CT-VO | Vague or Overbroad |
| **CN** | **Contracts** |
| CN-BR | Breach |
| **CS** | **Corporations** |
| CS-NP | Non-Profit Corporations |
| **ST** | **Statutes** |

ST-AP          Applicability
ST-IP          Interpretation
ST-LI          Legislative Intent
ST-VA          Vagueness