This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

### IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40135**

**BENAVIDEZ CONSTRUCTION LLC,**

Plaintiff-Appellee,

v.

**PAUL LEWICKI; ELIZABETH PHILLIP; STREAMLAND LLC;**

a Delaware limited liability company;

**and ROSENALM WILDLIFE INSTITUTE LLC, a Delaware limited liability company,**

Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF MORA COUNTY**
**Emilio J. Chavez, District Court Judge**

Arnold Padilla
Albuquerque, NM

for Appellee

Sheri A. Raphaelson
Española, NM

for Appellants

### MEMORANDUM OPINION

**WRAY, Judge.**

**{1}** Defendants Paul Lewicki, Elizabeth Phillip, Streamland LLC, and Rosenalm Wildlife Institute LLC appeal the district court's judgment in favor of Plaintiff Benavidez

Construction LLC, which was owned by Manuel Benavidez. This case involves a contract dispute over payment for the construction and renovation of Defendants' Paul Lewicki and Elizabeth Phillip's home. As both parties and the district court acknowledged, no written contract governed the parties' expectations for the project. Instead, the parties agreed that Defendants hired Plaintiff for "construction and renovation work," and Defendants paid invoices as Plaintiff submitted them. Disputes arose, however, about payment for "extras"—work Defendants maintained they did not approve in advance. After more than three years, Plaintiff stopped all activity on the property and filed a complaint against Defendants. Following a six-day bench trial, the district court entered judgment in favor of Plaintiff for breach of contract. On appeal, Defendants contend that the damages awarded are unsupported by any enforceable contract. We affirm.

**DISCUSSION**

**{2}** Because this is a memorandum opinion prepared solely for the benefit of the parties, we set forth only those facts necessary to our analysis as they become relevant.

**{3}** Defendants make six specific arguments on appeal. The first four relate to whether the district court improperly decided issues about broad categories of damages and the last two relate more specifically to the damages for particular projects. Before we begin with the four broad damages arguments, we note that in large part, Defendants contend that the district court "made no [c]onclusions of [l]aw, but only [f]indings of [f]act," and that "[i]t is specifically the glaring <u>absence</u> of [f]indings of the elements of an enforceable contract . . . where the [district c]ourt's error is contained." *See* Rule 1-052(A) NMRA (requiring the district court in nonjury trials to "enter findings of fact and conclusions of law when a party makes a timely request"). Appellate courts, however, "are not bound . . . by the labels attached" by the district court or the parties and whether it is a finding of fact or conclusion of law is "itself a question of law and, therefore, freely reviewable in this [C]ourt." *Edens v. N.M. Health & Soc. Servs. Dep't*, 1976-NMSC-008, ¶ 9, 89 N.M. 60, 547 P.2d 65. We therefore read the district court's findings of fact as a whole to determine whether taken together, the judgment is justified. *See Bachmann v. Regents of Univ. of N.M.*, 2021-NMCA-050, ¶ 3, 496 P.3d 604; *see also In re Hilton's Est.*, 1982-NMCA-104, ¶ 17, 98 N.M. 420, 649 P.2d 488 ("Ultimate facts and conclusions of law are often indistinguishable, and their intermixture in the [district] court's decision as written does not create reversible error where a fair construction of them justifies the court's judgment.").

**{4}** Generally, the district court found that "the parties entered into an agreement regarding the project on [D]efendant[s'] property" but that the agreement did not detail the breadth, scope, and billing for the project. We view this finding as a determination that the breadth, scope, and billing terms of the contract were ambiguous. *See Mark V, Inc. v. Mellekas*, 1993-NMSC-001, ¶¶ 12-13, 114 N.M. 778, 845 P.2d 1232 (holding that "[a]n ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity"). As a result, the district court turned to evidence of the parties' course of performance to discern the terms of the parties' agreement. *See id.* ("Once the

agreement is found to be ambiguous, the meaning to be assigned the unclear terms is a question of fact" that "must be resolved by the appropriate fact[-]finder."); *Bachmann*, 2021-NMCA-050, ¶ 24 (noting that where a contract is ambiguous, the judge, as "the fact-finder[,] may consider . . . evidence of . . . course of performance of the contract"). This is evident in the following findings.

{5} Plaintiff billed approximately $4.76 million. Defendants contended that they agreed to pay only amounts based on written or express approval and they only approved approximately $2.84 million in bids (or 64 percent of the total amount billed by Plaintiff). Defendants, however, paid approximately $4.46 million (or 94 percent of the amount billed by Plaintiff), and Plaintiff sought the balance of approximately $281,000.[1] From this it is apparent that the district court determined that Defendants by their conduct agreed to pay and did pay far more than the expressly approved bids. *See id.* (construing the parties' agreement, "as evidenced by their conduct and practices" to ascertain "their intention and understanding" of the agreement). Defendants do not specifically challenge these findings on appeal. *See Roybal v. Chavez Concrete & Excavation Contractors, Inc.*, 1985-NMCA-020, ¶ 11, 102 N.M. 428, 696 P.2d 1021 ("Unless findings are directly attacked, they are the facts on appeal."). We therefore consider Defendants' arguments in this context—an ambiguous agreement that the district court construed in light of the parties' conduct—to evaluate the evidence supporting the district court's findings.

## I.       Defendants' Broad Damages Arguments

{6} Defendants challenge the district court's damages determinations regarding (1) amounts related to invoices for "extras," (2) negotiated reductions for certain invoices, (3) modification of the agreement in order to complete the project, and (4) employment-related taxes on materials. We address each of these arguments in turn.

## A.       Invoices for Extras

{7} The parties and the district court defined "extras" as "work that did not have a specific bid" and the district court determined that Defendants owed damages for the payment of extras. Defendants broadly contend that the evidence did not support that the invoices for "extras" were enforceable contracts and point to their own evidence for support. As we have explained, the district court's findings read as a whole indicate that the parties' agreement was ambiguous and their course of performance supported a conclusion that Defendants agreed to pay more than only approved bids. Additional evidence presented at trial supports this conclusion.

{8} Benavidez and Defendants testified, and Defendants concede on appeal, that Defendants requested changes that were not part of the original plans and were not initially anticipated by the parties. Several construction workers employed by Plaintiff for the project testified that on multiple occasions Defendant Lewicki directly instructed

---

[1] The district court observed that the parties' figures did not cleanly calculate, and we use approximations for the purposes of our explanations.

them to make changes to different areas and that they complied with those instructions. Plaintiff completed the work then billed Defendants for it, and Defendants either partially or fully paid for the extra work. Benavidez testified that this procedure for billing continued for over two years. Approximately one year before the end of the project, Defendants began to contest the amounts due on some of the invoices—although they continued to pay. Defendants testified that they told Plaintiff not to perform any requested extras without submitting a bid and receiving an approval, and they did not agree for extras to be billed as time and materials, but they nevertheless paid the majority of the invoices despite not receiving a bid or giving their approval for the extras. Viewed in the light most favorable to Plaintiff, this evidence supports the course of performance found by the district court and its damages determination regarding Defendants' payment of extras. *See Balboa Const. Co. v. Golden*, 1981-NMCA-157, ¶ 43, 97 N.M. 299, 639 P.2d 586 ("Where there is proper evidence before the [district] court upon which to base its decision and to support its findings, on appeal we will review the evidence in a light most favorable to the successful party.").

## B.      Invoice Reductions

**{9}**      Defendants next challenge findings of fact Nos. 107, 109, and 111 and argue that the district court erred "in finding that there was no evidence of [i]nvoices being negotiated downwards because there were no documents to that effect." Specifically, Defendants contend that the district court did not consider "under oath testimony about the lowered prices . . . to be evidence," and also failed to make a finding that Defendants' testimony was not credible. The district court's findings of fact indicate that it considered Defendants' testimony about the negotiated prices and found that evidence to be insufficient to determine which invoices, if any, the parties agreed to reduce and by how much. As we explain, the evidence supported the district court's view.

**{10}**      At trial, both Benavidez and Defendants testified that some invoices were negotiated downwards, and Plaintiff agreed to some reductions in the amounts due. Specifically regarding the invoices numbered 2217, 2235, 2244, 2246, and 2254, Defendant Phillip testified that Plaintiff performed the requested work without her prior approval, the parties negotiated the balances due, the invoices were partially paid, and the claimed price reductions were not reflected in Plaintiff's accounting. Indeed, the invoice tracker exhibit reflected only the original invoiced amount and no reduction. Benavidez testified that each invoice for extras involved a negotiation between Plaintiff and Defendant Lewicki, and after work stopped on the project and before trial, Plaintiff viewed some of those negotiated invoices as reinstated in full and reflected all other invoices not paid in full in the invoice tracker.

**{11}**      The district court weighed the testimonial and documentary evidence presented by the parties and resolved the discrepancies in Plaintiff's favor. *See Shaeffer v. Kelton*, 1980-NMSC-117, ¶ 13, 95 N.M. 182, 619 P.2d 1226 (holding that in a bench trial, "only the trial court is permitted to weigh the testimony, determine credibility, and reconcile inconsistent or contradictory statements"). Defendants ask us to reweigh the evidence.

We construe the district court's findings so as to uphold its judgment rather than to reverse it and do not "substitute our judgment for that of the fact[-]finder." *See Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶¶ 25, 28, 146 N.M. 473, 212 P.3d 361 (internal quotation marks and citation omitted). As a result, we conclude that sufficient evidence supported the district court's findings regarding the invoice reductions.

## C.      Contract Modification

**{12}**     Defendants third maintain that the parties "agreed, in writing" to modify the contract "to finish the job for a total of $120,000" and the district court improperly found to the contrary. In findings Nos. 96, 99, and 104, the district court found that "[t]he parties did not have a final agreement for modification" because "the terms [of the modification] were never finalized based on the evidence presented to the court"; and "each party's proposed modification was significantly different from the other." Specifically, "[P]laintiff's offer was . . . to 'complete the remaining work' [and D]efendants' acceptance was . . . for unpaid balances in addition to completion of the remaining work." Benavidez testified that there was no agreement to limit what Defendants owed to $120,000. By email, Plaintiff communicated to Defendants that the contract modification was not finalized and requested that Defendants provide a list of the remaining work to be completed in order to finalize the terms of their agreement and sign a document to that effect. In contrast, Defendants presented testimony that they were willing to pay Plaintiff $120,000 to finish the project but also to settle any outstanding amounts due to Plaintiff. Thus, substantial evidence supported the findings that the parties reached no meeting of the minds regarding the agreement. *See Balboa Const. Co.*, 1981-NMCA-157, ¶ 20 (holding under a substantial evidence standard that "[t]he parties' intentions to become bound to a contract . . . are questions of fact depending upon the circumstances of the case"). To the extent there was contradictory evidence, it is for the district court to determine credibility. *See Shaeffer*, 1980-NMSC-117, ¶ 13. Accordingly, viewing "the evidence in a light most favorable to the successful party," we leave undisturbed the district court's determination that the evidence did not support a contract modification. *Balboa Const. Co.*, 1981-NMCA-157, ¶ 43.

## D.      The Employment-Related Taxes on Materials and the Markup

**{13}**     Defendants further contend that the district court "erred in holding . . . Defendants liable for paying . . . Plaintiff for employment related taxes on the cost of materials," because Defendants produced evidence that they did not agree to make such payments and the district court did not find the taxes to be part of a contract. In support, Defendants state that "the [district c]ourt found that the charge for th[ese taxes] was '. . . not sufficiently explained.'" The entire finding by the district court states, "The inclusion on the invoice for extras of workman's compensation and payroll taxes into the markup of 30% was not sufficiently explained or addressed by either party." Thus, the district court considered the taxes to be part of a percentage markup and found that neither party explained the inclusion of those taxes within the markup. The district court's ultimate damages calculation was derived from the invoices that included the markup

(and the taxes). We therefore consider whether the evidence supported a conclusion that Defendants agreed to pay the employment-related taxes that were included in the markup.

**{14}**    Plaintiff presented testimony that the markup (1) was Plaintiff's general business practice; (2) was explained to Defendants at the beginning of the project, including an explanation of the multiple charges related to profit, workers' compensation, payroll taxes, and insurance; and (3) Defendants paid the markup without objection for at least a year and half. Plaintiff's bookkeeper admitted that workers' compensation charges should probably not have been included for invoices containing equipment and goods. But she also explained that Plaintiff generally charged the markup on top of all other costs and that the markup for the materials included ordering, administration, pick-up, and delivery, and provided coverage for any problems that might arise from providing the services related to those materials and equipment. Defendant Phillip testified that at the beginning of the project she inquired about the markup and was told by Plaintiff's bookkeeper that the money would go to the State of New Mexico, the charge was mandatory, and it was the standard way of doing business in the state. Defendant Lewicki testified that the markup was not among the many disputes related to the invoices.

**{15}**    The district court considered the evidence presented and relied on the parties' course of performance to make its determination. *See Bachmann*, 2021-NMCA-050, ¶ 24. The evidence supported the district court's findings that Defendants paid the majority of all invoices, many of which included the markup. We therefore conclude that sufficient evidence supported the district court's damages calculation, which included the taxes within the markup.

**{16}**    Defendants suggest that "these amounts were fraudulently billed" because no taxes were paid to the state and encourage this Court to decline to enforce payment "as an equitable remedy for unclean hands of . . . Plaintiff." Defendants, however, raise this issue for the first time on appeal and did not argue this theory before the district court. Accordingly, we decline to address this claim. *See Valerio v. San Mateo Enters., Inc.*, 2017-NMCA-059, ¶ 20, 400 P.3d 275 (declining to address arguments on appeal related to a similar unpreserved equitable claim).

## II.      The Project-Specific Damages Arguments

**{17}**    Defendants also challenge the damages award related to specific projects. Defendants maintain that no enforceable contract supported the amounts awarded in relation to "extra work" performed on a rock wall and to the installation of pavers.

## A.      The Perimeter Rock Wall

**{18}**    We first briefly summarize the district court's rock-wall findings. Plaintiff provided an initial estimate for the wall before receiving the architectural plans. Nevertheless, "[t]here was a contract to build the wall in accordance to the [architectural] plans and to

bill for the wall in linear f[eet]." The architectural plans "required the wall to maintain [eight feet] of height and contain pilasters with caps to address the change of elevation and reduce the amount of wall that would exceed [eight feet]." Plaintiff claimed it was due an additional amount greater than the bid for the work on the wall because "[t]he architectural plan . . . substantially change[d] the scope of work" and "[w]ith the change in elevation, in order to follow the plan, some of the wall had to be constructed substantially higher than [eight feet]." The district court found that Plaintiff "built the wall in accordance with plan" but that when Plaintiff received the plans and "understood . . . the topography," Plaintiff should have adjusted the price and "communicated the difference to [D]efendants." As a result, the district court awarded Plaintiff 50 percent of the claimed amount, to account for caps, pilasters, and any additional portion of the wall "higher than [eight feet]."

{19}    On appeal, Defendants broadly dispute that Plaintiff is entitled to be paid more than was bid, because nothing more was "the product of offer and acceptance" and "there [was] no finding as to what made this extra work the subject of an enforceable contract." Defendants also contend that "Plaintiff's claim for [q]uantum [m]eruit was denied so that could not be the legal basis for" ordering payment either. Because we conclude that the damages were supported, we do not address the quantum meruit argument. We conclude that the evidence at trial supported the district court's findings that Plaintiff was entitled to payment of 50 percent of the amount billed that was above the original bid.

{20}    Benavidez testified at trial that at an initial meeting, Defendant Lewicki provided information about the perimeter rock wall, and after the meeting, Plaintiff sent Defendants an estimate of the cost of the wall based on work for a different client. At Defendants' request, Plaintiff started working on the wall before it received the architectural plans. When Plaintiff later received the plans, and they were followed as best as possible, but Plaintiff billed Defendants for additional square footage because the terrain made it "impossible" to maintain eight feet "through th[e] whole yard wall." Benavidez testified that throughout the project the specifications of the wall changed tremendously and given the terrain, some portions of the wall were above eight feet high and pilasters and caps were added in multiple locations. Plaintiff's expert testified that the "variations in wall heights were justified by the differences in the ground" and Defendants' architectural plans showed that some portions of the wall needed to exceed eight feet in height. Defendants admitted that the placement of the pilasters determined the height of the wall at some sections and that the location of the pilasters was dictated by the slope of the terrain.

{21}    Though Defendants maintained that the pilasters, caps, and height were part of the original agreement and plans and that they did not request for the wall to be higher than eight feet, the district court weighed the evidence and concluded that Plaintiff deserved some compensation for the work. Viewing the evidence in the light most favorable to Plaintiff as the prevailing party and disregarding any inferences to the contrary, *see Bovee v. State Highway & Transp. Dep't*, 2003-NMCA-025, ¶ 27, 133 N.M. 519, 65 P.3d 254, we decline to reweigh the evidence or substitute our judgment

for that of the fact-finder, *see Las Cruces Pro. Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. We therefore affirm the district court's findings regarding the perimeter rock wall.

## B.      The Courtyard Pavers

{22}     Last, we consider the district court's findings regarding the paver installation. The pavers were originally delivered and partially installed by Plaintiff, before Defendants discovered that they were the wrong color. At Defendants' request, the pavers were removed, cleaned, returned, and new pavers later installed. The district court found, in relevant part, that before "the first installation, the parties did not have a specific bid or acceptance" but the "installation . . . was in line with the work that was done throughout the project" by Plaintiff and that "[t]he parties had a contract for the installation of the pavers and should be compensated for the removal." The district court found that "[P]laintiff [was] not at fault for the wrong delivery or immediate installation of the original pavers," and that "[P]laintiff and [D]efendants agreed to a bid regarding the second installation of pavers in the courtyard [and t]he new pavers were ultimately installed." Defendants' argument is somewhat unclear between the brief in chief and the reply, as they appear to first challenge the portion of the damages award for the first installation and the removal and then shift to contesting the second installation. Both Benavidez and Defendant Lewicki, however, testified that they had an agreement as to the second installation, which is consistent with the district court's finding that there was such an agreement. We therefore focus on whether the district court's findings relating to the first installation and removal of the pavers were supported by the evidence.

{23}     Benavidez testified that he had an agreement with Defendant Lewicki for the installation of the courtyard pavers, that in anticipation of the first installation he did work to prepare for the laying of the pavers, and that he billed Defendants accordingly. The district court heard testimony that at least a few weeks before the first installation, Defendant Lewicki told Benavidez and the workers to proceed with the installation as soon as the pavers were delivered to the job site and gave specific instructions for the installation. When the pavers were first delivered, Plaintiff immediately started the installation. Defendant Lewicki called and instructed Benavidez to stop any work, remove the incorrectly delivered pavers, clean them, and assist with their return to the provider. Approximately 65 percent of the work was completed before Plaintiff stopped the first installation. During the delivery of a second set of pavers, the delivery truck had an accident, and Defendant Lewicki instructed Plaintiff to help with the rescue, which it did and billed Defendants accordingly. Defendant Lewicki testified that prior to the first installation there was no agreement with Plaintiff as to price and denied giving instructions to Plaintiff or the construction workers. The evidence was conflicting, but the district court made an implicit credibility determination to adopt Plaintiff's evidence. *See Shaeffer*, 1980-NMSC-117, ¶ 13. Accordingly, we conclude that the evidence supported the district court's findings.

## CONCLUSION

**{24}**   We affirm the district court.

**{25}   IT IS SO ORDERED.**

**KATHERINE A. WRAY, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**ZACHARY A. IVES, Judge**