This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**SUSAN BISHOP and MARK SKOFIELD,
as Class Representatives in their capacities
as Personal Representatives of the Estate of
RICHARD H. SKOFIELD, Individually and
in his capacity as Class Representative,**

Plaintiffs-Appellants/Cross-Appellees,

v. NO. 25,510

**THE EVANGELICAL LUTHERAN GOOD
SAMARITAN SOCIETY, a foreign
corporation d/b/a MANZANO DEL SOL
GOOD SAMARITAN VILLAGE,**

Defendant-Appellee/Cross-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Wendy E. York, District Judge (presiding until appeal)
Beatrice J. Brickhouse, District Judge (currently presiding)**

Eric Sedillo Jeffries, LLC
Eric Sedillo Jeffries
Albuquerque, NM

Law Offices of Brian A. Thomas, PC
Brian A. Thomas
Albuquerque, NM

for Appellants

Quarles & Brady LLP
Daniel E. Conley
Milwaukee, WI

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Martha G. Brown
Albuquerque, NM

for Appellee

**MEMORANDUM OPINION**

**SUTIN, Judge.**

This case returns to us following reversal by our Supreme Court of our decision in *Bishop v. Evangelical Lutheran Good Samaritan Society (Bishop I)*, 2008-NMCA-033, 143 N.M. 640, 179 P.3d 1248, and remand to determine the issues that remain. *See Bishop v. Evangelical Good Samaritan Soc'y (Bishop II)*, 2009-NMSC-036, ¶¶ 1, 30, 146 N.M. 473, 212 P.3d 361. The issues we address relate primarily to the district court's determinations regarding prejudgment interest and calculation of damages. We affirm the district court's determinations on those and other issues raised on appeal. Further, we remand this case to the district court for amendment of the judgment consistent with this opinion.

**BACKGROUND**

Defendant Evangelical Lutheran Good Samaritan Society (Good Samaritan) is a nonprofit corporation that owns Manzano Del Sol Good Samaritan Village (Manzano). Manzano consists of two facilities situated in New Mexico: a nursing home and senior independent living apartments. Since 1985, Manzano has been governed by the Continuing Care Act, NMSA 1978, §§ 24-17-1 to -18 (1985, as amended through 2005) (the Act).

Manzano's residents pay monthly service fees. Plaintiff Richard H. Skofield was a resident at Manzano until his death. He and other residents entered into entrance agreements to live in apartments at Manzano. This case arose from Skofield's objection to percentage increases in service fees on the first day of January of the years 1994 (2.5%), 1995 (6.0%), 1996 (3%), 1997 (4.0%), 1998 (2.0%). During those years, the Act required service-fee increases at facilities such as Manzano to be based on "economic necessity, the reasonable cost of operating the community, the cost of care[,] and a reasonable return on investment." Section 24-17-5(B)(11).[1]

---

[1] This statute was amended in 2005 to state that the fee increase requirements be "defined by rules promulgated by the aging and long term services department no later than January 31, 2006[.]" Section 24-17-5(B)(11); *see* 9.2.24.7 to .15 NMAC (1/31/06); *see also Bishop II*, 2009-NMSC-036, ¶¶ 13 n.1, 23 n.3 (stating that the amended regulations are not applicable and limiting the court's "consideration to the language used by the Legislature and in effect at the time").

Skofield filed a complaint against Good Samaritan in July 1999 and an amended complaint in April 2001, in his individual capacity and as class representative, alleging that Good Samaritan failed to comply with Section 24-17-5(B)(11) and seeking compensation for service-fee overcharges, plus prejudgment interest. The court certified the case as a class action in September 2001 and certified a class of "residents of Manzano . . . who were subject to fee increases between July 30, 1993 and July 30, 1999." It appears that of 287 putative members of the class who were mailed notices of the class action, 193 were returned as undeliverable, that at the time the notices were sent there were actually only 111 putative class members still living at Manzano, that there were some persons who were given notice who were not within the class as defined by the court, and that fifty members receiving notice gave notice of their intent to opt out of the class.

The case was tried by the district court in September 2002. The court entered findings of fact and conclusions of law, but numerous post-trial proceedings followed in December 2002. The court reopened the case in February 2004 to hear evidence solely on the turnover rate at Manzano during the class period, and an evidentiary hearing on that issue occurred in May 2004. In July 2004, the court placed its rulings on outstanding issues in a letter to the parties. In December 2004, the court entered

a judgment for "the Plaintiff Class" and also filed amended findings of fact and conclusions of law.

The district court determined that Good Samaritan violated the Act and breached the terms of the entrance agreements because it failed to consider economic necessity and reasonable return on investment in setting its service-fee increases as required in the agreements and in Section 24-17-5(B)(11). The court held Good Samaritan liable to Plaintiffs and ultimately awarded damages of $122,548.[2] The court also awarded Plaintiffs prejudgment interest for the period beginning with the filing of Skofield's complaint, but refused to award Plaintiffs pre-complaint prejudgment interest.

In arriving at its service-fee overcharge damages award, the district court measured overcharges using a threshold reasonable rate of return of 15%, but reduced Good Samaritan's excess revenue and the accumulated damages to Plaintiffs to $154,415 after applying credits for the years 1998 and 1999 based on Good

---

[2] The court's amended findings of fact and conclusions of law awarded Plaintiffs $154,415. The court's judgment, however, awarded Plaintiffs $122,548. The court's amended findings of fact and conclusions of law were filed on December 30, 2004, but its judgment was filed two days earlier, on December 28, 2004. The Supreme Court in *Bishop II* stated that the district court awarded $154,415 to Plaintiffs. *Bishop II*, 2009-NMSC-036, ¶ 5. The earlier filed judgment incorporated and adopted the amended findings of fact and conclusions of law by reference. We believe that the amount awarded in the court's judgment controls even though entered before the court's amended findings of fact and conclusions of law. The parties do not contend otherwise.

5

Samaritan's having charged rates below the 15% threshold those years, and after applying a resident turnover rate which had the effect of reducing the number of people who could complain about improper rate increases. The court then reduced the damages award to $122,548 after considering the fact that a number of putative class members opted out of membership in the class. Plaintiffs appealed, and Good Samaritan cross-appealed.

Plaintiffs asserted on appeal that the district court erred by (1) failing to award prejudgment interest up to the date of the complaint; (2) reducing damages by giving credits below the statutory threshold; (3) reducing damages based on turnover; and (4) applying the statute of limitations to bar claims for damages that resulted from a rate increase imposed before, but that were suffered within, the class period. They sought this Court's remand instructing the district court to amend its judgment and award Plaintiffs $1,112,662, plus prejudgment interest to run from August 1, 1993, the amount that Plaintiffs consider to be their full measure of damages.

Good Samaritan raised five issues in its cross-appeal: (1) the Act's requirement that fee increases be based on a "reasonable rate of return on investment" was unconstitutionally vague; (2) if the Act were interpreted correctly, the fee increases during the class period were reasonable; and (3) the district court abused its discretion by reopening the trial to permit Plaintiffs a second chance to meet their burden of

proof on damages; (4) the district court abused its discretion by awarding prejudgment interest for the period following the filing of the complaint; and (5) the district court abused its discretion by not decertifying the class because the court erred in entering a judgment that failed to identify the class members who were bound.

**The Appeal and Certiorari Proceedings, and the Current Remand to This Court**

In an opinion filed in January 2008, this Court reversed the judgment of the district court and remanded with instructions to enter judgment in favor of Good Samaritan. *Bishop I*, 2008-NMCA-033, ¶ 14. The basis for reversal was our view that the district court erred by construing the Act to require nonprofit providers such as Good Samaritan to base service-fee increases on a reasonable return on investment. *Id.* ¶ 11.

On a writ of certiorari, our Supreme Court reversed this Court, holding that under the Act, nonprofit providers are able and required to consider a reasonable rate of return on investment when calculating service-fee increases. *Bishop II*, 2009-NMSC-036, ¶¶ 16-18, 25, 29, 30. The Court was not persuaded by Good Samaritan's constitutional vagueness argument. *Id.* ¶ 24. The Court also addressed whether the district court's judgment was supported by substantial evidence. *Id.* ¶¶ 25-29. The Court noted that in the district court, Plaintiffs' expert presented calculations on return on investment that yielded the following percentages: 16.09% in 1993, 17.17% in

7

1994, 18.13% in 1995, 21.34% in 1996, 22.42% in 1997, 12.62% in 1998, and 10.18% in 1999. *Id.* ¶ 26. The Court also noted that Good Samaritan's accountant testified that a reasonable rate of return would fall between 12 and 15%. *Id.* The Court further noted that the district court adopted these figures in its findings and conclusions. *Id.* In addition, the Court noted that the district court held that Good Samaritan breached the entrance agreements resulting in Good Samaritan having "earned rates of return in excess of even its own representatives' determination of what is reasonable." *Id.* (internal quotation marks omitted). After noting these findings and conclusions of the district court, the Court determined that "[s]ubstantial evidence supports the district court's findings and conclusions on this point." *Id.* The Court held that substantial evidence existed to uphold the district court's determination that Good Samaritan violated the agreements and the Act "by imposing rate increases without considering reasonable return on investment." *Id.* ¶ 29. The Supreme Court remanded the case to this Court "to determine the remaining issues raised before [this] Court on appeal and cross-appeal." *Id.* ¶ 30. We therefore proceed in this opinion to address those issues.

**DISCUSSION**

**I. Plaintiffs' Appellate Points**

**A. Prejudgment Interest**

8

The district court awarded prejudgment interest only from the date of the filing of the complaint. Plaintiffs complain that the court erred in failing to award prejudgment interest covering the period of August 1, 1993, to the date the complaint was filed.

"In New Mexico, the award of prejudgment interest is governed by the common law and NMSA 1978, Sections 56-8-3 [(1983),] -4(B) [(1993) (amended 2004)]." *Smith v. McKee*, 116 N.M. 34, 36, 859 P.2d 1061, 1063 (1993). Section 56-8-3(A) through (C) states that the rate of interest in the absence of a written contract fixing the rate "shall be not more than fifteen percent annually" in three instances, namely, (A) "on money due by contract[,]" (B) "on money received to the use of another and retained without the owner's consent expressed or implied[,]" and (C) "on money due upon the settlement of matured accounts from the day the balance is ascertained." Section 56-8-4(A) relates to interest on judgments and decrees, and Section 56-8-4(B), under certain guidelines, permits interest from the date the complaint is served on the defendant. Section 56-8-4(C) independently states that nothing in the section "shall affect the award of interest or the time from which interest is computed as otherwise permitted by statute or common law."

The court refused to award pre-complaint prejudgment interest as a matter of right under Section 56-8-3 because the amount owing was not fixed or readily

ascertainable. The court explained that while it had discretion under Section 56-8-3 to award prejudgment interest "even if the amount owing was not fixed or readily ascertainable, the court must consider the equities in each case before doing so." The court determined that "[t]he equities do not favor an award for [Good Samaritan's] use and retention of Plaintiff[s'] money since [Good Samaritan] had very little guidance regarding how to comply with the [Act]."

Plaintiffs argue that in a breach of contract case the damages award should fully compensate the injured party and that the damages award should include the lost use of money. They argue, too, that Good Samaritan wrongfully profited from the overcharges. Although Plaintiffs fail to mention Sections 56-8-3 and 56-8-4 in any regard in their brief in chief, in their reply brief, and based on assertions in Good Samaritan's answer brief, Plaintiffs acknowledge that they "seek to recover prejudgment interest as a matter of discretion under either [Section] 56-8-3 or [Section] 56-8-4."

We think it useful to discuss pertinent case law on the issues. Early on, our Supreme Court determined that under NMSA 1953, Section 50-6-3(A) (Vol. 8) (current version at Section 56-8-3), in the absence of a readily ascertained indebtedness amount, the allowance of interest as an element of total damages is a matter of discretion and not a matter of right. *O'Meara v. Commercial Ins. Co.*, 71

N.M. 145, 151-52, 376 P.2d 486, 490-91 (1962). In connection with this proposition, the Court cited and relied on *Restatement (First) of Contracts* § 337(b) (1932). *O'Meara*, 71 N.M. at 152, 376 P.2d at 490-91. *Restatement* Section 337 reads:

> If the parties have not by contract determined otherwise, simple interest at the statutory legal rate is recoverable as damages for breach of contract as follows:
>
> (a) Where the defendant commits a breach of a contract to pay a definite sum of money, or to render a performance the value of which in money is stated in the contract or is ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices of the subject matter, interest is allowed on the amount of the debt or money value from the time performance was due, after making all the deductions to which the defendant may be entitled.
>
> (b) Where the contract that is broken is of a kind not specified in Clause (a), interest may be allowed in the discretion of the court, if justice requires it, on the amount that would have been just compensation if it had been paid when performance was due.

After quoting Section 337 and stating that Subsection (b) applied in the case, the Court in *O'Meara* stated that recognition of this *Restatement* rule "should aid the trial courts in their determination of the vexatious problems relating to the awarding or not awarding of interest, and will avoid the necessity of making the fine distinctions which many courts have done." *O'Meara*, 71 N.M. at 153, 376 P.2d at 491. After *O'Meara*, our Supreme Court adopted *Restatement* Section 337(a) and, following that

11

section, the Court stated that when the amount is "ascertainable by mathematical calculation from a standard fixed in the contract or from established market prices," Section 56-8-3 is applicable. *Shaeffer v. Kelton*, 95 N.M. 182, 187-88, 619 P.2d 1226, 1231-32 (1980) (internal quotation marks and citation omitted); *see also Grynberg v. Roberts*, 102 N.M. 560, 562-63, 698 P.2d 430, 432-33 (1985) (determining that under the *Shaeffer* rule, Section 56-8-3 and *Restatement* Section 337(a) applied and that *Restatement* Section 337(b) did not apply, because the debt was ascertainable by mathematical calculation from a standard fixed in the contract). In *Grynberg*, the Court referred to *Restatement* Section 337 as stating the common law rule of prejudgment interest. *Grynberg*, 102 N.M. at 563, 698 P.2d at 433.

Based on *O'Meara*, *Shaeffer*, and *Grynberg*, our Supreme Court in *Mascarenas v. Jaramillo*, 111 N.M. 410, 806 P.2d 59 (1991), confirmed that when Section 56-8-3 applies and the indebtedness is ascertainable as stated in *Restatement* Section 337(a), that *Restatement* section applies and interest is due as a matter of right. *Mascarenas*, 111 N.M. at 414, 806 P.2d at 63. The Court added that in breach of contract cases "damage awards should fully compensate the injured party" and that the breaching party is "justly responsible for all of the damages flowing naturally from the breach." *Id*. (internal quotation marks and citation omitted). Yet, reiterating that it had adopted *Restatement* Section 337(a), the Court in *Mascarenas* recognized earlier stated law

12

that an award of prejudgment interest should not be made "arbitrarily without regard for the equities of each particular situation." *Mascarenas*, 111 N.M. at 414, 806 P.2d at 63 (internal quotation marks and citation omitted). In *Mascarenas*, the Court reversed the district court's award of prejudgment interest because it did not appear that the court "weighed the equities involved" and because the findings did not justify a denial of interest. *Id.* at 414-15, 806 P.2d at 63-64; *see also Smith*, 116 N.M. at 36-37, 859 P.2d at 1063-64 (adhering to *Shaeffer* and *Restatement* Section 337(a) and concluding that when a district court does not make a finding that interest was awarded as a matter of right, the award is made in the court's discretion).

Following the rules expressed in *O'Meara*, *Shaeffer*, and *Grynberg*, in *Kueffer v. Kueffer*, 110 N.M. 10, 12, 791 P.2d 461, 463 (1990), which involved that part of Section 56-8-3 relating to the use and retention of another's money without the other's consent, *see* § 56-8-3(B), our Supreme Court stated that "[t]he trial court has discretion to award prejudgment interest, if justice requires, when the contract amount is not ascertainable." *Kueffer* also stated that "[p]rejudgment interest is meant to compensate a plaintiff for injuries resulting from the defendant's failure to pay and the loss of use and earning power of [the] plaintiff's funds expended as a result of the defendant's breach." 110 N.M. at 12, 791 P.2d at 463. Then, in *State ex rel. Bob Davis Masonry, Inc. v. Safeco Insurance Co. of America*, 118 N.M. 558, 883 P.2d 144

(1994), the Court stated that whether as a matter of right or in the district court's discretion under Section 56-8-3 "we examine any countervailing equities to determine whether the award was properly made." *Bob Davis Masonry, Inc.*, 118 N.M. at 561, 883 P.2d at 147.

The foregoing cases tell us that Section 56-8-3(A) and *Restatement* Section 337(b) apply in the present case and that the award of interest was left to the sound discretion of the district court. While an award of prejudgment interest is to be considered in compensating the injured party in breach of contract cases, in considering that award in the present case, the district court was permitted to consider the equities of the particular situation. The court exercised its discretion and, in considering an award, the court considered equities. In doing so, the court refused to award pre-complaint prejudgment interest because Good Samaritan received "very little guidance" as to how it was to comply with the Act. We hold that the district court did not abuse its discretion.

**B.      Credits and Deductions in Assessing Damages**

The district court made the following findings in regard to the credits and deductions it applied to excess revenue from overcharging:

64. Gross excess revenue for the class period, as modified by the [c]ourt's post-trial rulings, is $888,294. Since the rate of return did not exceed 15% in 1998 and 1999, credit must be given for those years. For

14

1999, the credit amount is $410,916. For 1998, the credit is $147,204. The adjusted excess revenue is $330,174.

65. There must be a deduction from the $330,174 to reflect the turnover rates. Such a deduction ensures that . . . Plaintiffs are not compensated for those apartments that may have been turned over to a new resident who had agreed to the higher rates, persons who died, or left the facility. That deduction is $175,759 leaving the excess revenue, less turnover rate at $154,415.

Plaintiffs do not contest the numbers; they contest the court's application of credits and deductions to reduce their damages.

**1.      Standard of Review**

We do not perceive that the applicable findings of fact on which the measurement of damages was based have been successfully attacked as being unsupported in the evidence. We review de novo the application of law to the facts. *See, e.g.*, *N.M. Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 7, 127 N.M. 654, 986 P.2d 450. We give deferential treatment to the manner in which the district court analyzed the damages model presented by Plaintiffs and to the court's damages evaluations and determinations. *See Sierra Life Ins. Co. v. First Nat'l Life Ins. Co.*, 85 N.M. 409, 414, 512 P.2d 1245, 1250 (1973) (stating that appellate courts "will not attempt to second guess the trial court's determination of the proper measure to be applied for damages if that trial court had several alternatives before it supported by substantial evidence"); *Moody v. Stribling*, 1999-NMCA-094, ¶ 40, 127 N.M. 630,

15

985 P.2d 1210 ("As long as there is a reasonable method used to achieve an amount of damages, we will accept that amount.").

**2.      Credits**

Plaintiffs argue that the allowance of credits by the district court runs contrary to the Supreme Court's ruling in *Capo v. Century Life Insurance Co.*, 94 N.M. 373, 610 P.2d 1202 (1980), because Good Samaritan was taking advantage of an illegal contract. Capo sued his insurer who, in lending money to Capo, violated a criminal statute, NMSA 1978, § 30-16-15 (1963), by coercing Capo to purchase insurance in order to obtain a loan. *Capo*, 94 N.M. at 376, 610 P.2d at 1205. The Court held that the insurer's assignee could not retain the premiums paid by Capo because that "would in effect validate the illegal contract, nullify the statutory penalty[,] and permit [the assignee] to take advantage of the criminal act." *Id*. at 377, 610 P.2d at 1206. We are not persuaded. Good Samaritan did not contract with Plaintiffs in violation of a statute, much less a criminal statute carrying a penalty for its violation. While Good Samaritan failed to follow a statutory requirement that was placed in the entrance agreements, we do not consider that in the same category as entering into a contract forbidden under criminal law. *See Smith v. Tinley*, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984) (refusing to apply *Capo* where "[t]he agreement . . . [was] far from illegal").

16

Plaintiffs further argue that Good Samaritan voluntarily decided not to charge amounts for rent and that this unconditional benefit conferred on Plaintiffs bars Good Samaritan from receiving a credit by way of restitution. *See Restatement (First) of Restitution* § 112 (1937); *see also Cheesecake Factory, Inc. v. Baines*, 1998-NMCA-120, ¶ 6, 125 N.M. 622, 964 P.2d 183 (holding that where a judgment debtor paid a judgment voluntarily, the court could not compel the judgment creditor to return the payment, stating that this followed from the general rule that a party cannot recover money voluntarily paid with full knowledge of the facts even if no payment obligation existed). In addition, Plaintiffs argue that the court impermissibly reduced damages already incurred because the reduction was based on retrospective rate-setting for later years. Plaintiffs contend that this violated contract-breach principles requiring that the injured party be fully compensated, including receiving consequential damages flowing from the breach, such as loss of the use of money. We are equally unpersuaded by these arguments. Plaintiffs' damages model used a retrospective assessment of increases pursuant to which aggregate damages were determined based on apartments and not individuals, and on the extent to which increases exceeded a threshold rate of return. The entire process in which the court engaged on the issue of damages involved retrospective determination of a reasonable threshold rate, a process that benefitted Plaintiffs. Particularly, based on the manner in which Plaintiffs

17

presented their damages methodologies to the court, we see no reason why the court could not also consider and give credit for monetary benefits to Plaintiffs from undercharges in certain years, while at the same time it considered overcharges in certain years.

**3.    Deductions**

Plaintiffs assert that Good Samaritan did not carry its burden of proof in claiming deductions based on turnover because it failed to introduce direct evidence of turnover. Thus, according to Plaintiffs, the court's finding number 65 on turnover "should be overruled." Plaintiffs also assert that Good Samaritan's claim to deductions required its reliance on illegal contracts as a defense to liability. Plaintiffs further assert that Good Samaritan did not demonstrate that new residents knowingly accepted rates that offended their rights protected by the Act and thereby waived their rights to be free of excessive charges.

We reject these contentions. There was evidence of turnover rate, and the court utilized that information in evaluating damages. Plaintiffs sought damages for the class in the aggregate considering only apartments and not individuals and claiming that they did not have to prove damages specifically, and we see no reason why the court could not evaluate those damages taking the turnover rate evidence submitted by Plaintiffs and Good Samaritan into consideration. Further, we see no basis on

18

which to determine that the entrance agreements with new residents were in any sense illegal or that Good Samaritan did not have the right to set new rates for new residents.

**4.        Summary of Credits and Deductions Issues**

In sum, we see no error in the application of law to the facts in the district court's application of credits and deductions in assessing damages. Nor do we see any irrationality in the court's assessments. The court was at liberty to determine if the damages model presented by Plaintiffs fairly represented the proper way of assessing damages. The court evaluated damages suffered in each calendar year correlated to the rates of return in excess of a threshold rate of return. We are not persuaded that in these circumstances Plaintiffs' view of a single and definite way to measure damages to make Plaintiffs whole was the only avenue to consider in arriving at the measurement. We determine that no damages rule or rationale by which Plaintiffs seek to bar consideration of credits and deductions applies. Plaintiffs fail to demonstrate error in the application of law or in factual determinations, and we will not overturn the district court's reasonable evaluation and measurement of damages considering credits and deductions.

**C.        The Bar of the Statute of Limitations**

Good Samaritan asserted and the district court applied the six-year statute of limitations in NMSA 1978, Section 37-1-3 (1975), to bar Plaintiffs' claim of

19

overcharges related to one particular fee increase, namely, a fee increase that was announced in November 1992 to be effective January 1, 1993. Based on a continuing-wrong theory, Plaintiffs assert a right to sue as each monthly overcharge occurred following January 1993. They argue that the statute is therefore inapplicable to service fee increases that were first charged in January 1993 and were still being charged at the start of the class period in August 1993, notwithstanding that the decision to implement the January 1, 1993, increase was made in 1992.

We are persuaded by Good Samaritan's position that Plaintiffs' claim derives only from Good Samaritan's singular act of charging the increased yearly fee on its effective date of January 1, 1993, and not from each monthly overcharge that followed that act during the year or from a continuing wrong notion based on the consequences of the initial fee increase. *See Tull v. City of Albuquerque*, 120 N.M. 829, 830-31, 907 P.2d 1010, 1011-12 (Ct. App. 1995) (stating, in an employment contract case, that the allegations "would establish that the [employer] committed a single wrong with continuing effects"; holding that for statute of limitation purposes the only actionable breach and wrong was the employer's initial refusal to increase the plaintiff's salaries; and rejecting the continuing wrong theory in which each paycheck constituted a new wrong for statute of limitations purposes).

## II.    Good Samaritan's Points

Good Samaritan's first two points on appeal were disposed of in *Bishop II*, 2009-NMSC-036.  The points were that the language in Section 24-17-5(B)(11) requiring fee increases to be based on "reasonable return on investment" is unconstitutionally vague, and that if the Act were interpreted correctly, the fee increases during the class period were "reasonable."  We, therefore, do not address these points. We turn to Good Samaritan's claims that the district court abused its discretion in three rulings.

## A.    Asserted Error in Reopening the Trial

Good Samaritan complains that the district court abused its discretion when it permitted Plaintiffs a second chance to meet their burden of proof on damages.  Trial occurred in September 2002.  The court decided to reopen the record in February 2004 for the purpose of allowing supplemental evidence on the turnover issue.  The standard of review is abuse of discretion. *See State v. Harrison*, 2000-NMSC-022, ¶ 56, 129 N.M. 328, 7 P.3d 478 (stating that appellate courts review a district court's decision to reopen the record for abuse of discretion).  We first discuss the background giving rise to the reopen issue, followed by the parties' arguments and our analysis.

## 1. Background

In December 2002, the court found that Plaintiffs had not shown that particular Plaintiffs lived, or had not shown the amount of time Plaintiffs lived in any particular apartment at any particular service fee amount after any allegedly improper increase in rent. The court also found that residents had moved in and out of apartments and that sometimes they had moved in and out before fee increases had gone into effect. Further, the court found that residents transferred from one apartment to another and in doing so had signed new contracts and had agreed to new rates. In addition, the court found that Plaintiffs' expert's damages methodology assigned damages to apartments and not individual residents and assumed that damages existed regardless of how many times an apartment was turned over to a new resident who agreed to a higher fee. Based on these findings, the court found that it was necessary to incorporate a turnover rate into the damages calculation, and the court selected a turnover rate of 29.8%. This turnover rate was taken from a defense exhibit, The State of Seniors Housing 2001 by the National Investment Center, the American Senior Housing Association, and Price WaterhouseCoopers. The court entered a finding that 29.8% "must be deducted from [Plaintiffs' damages] to reflect the turnover rate."

In February 2004, faced with proposed amendments to its findings of fact and conclusions of law, particularly with differing views of the parties in regard to burdens

22

of proof relating to damages, the court decided to look further into its prior ruling regarding the turnover rate. In a February 9, 2004, letter to the parties, the court explained why it was reopening the case to hear evidence on the turnover rate. The court expressed concern that neither party had offered sufficiently explicit testimony in 2002 of an exact turnover rate and that the court had likely erred in two respects in choosing and applying the 29.8% turnover rate. The court determined, among other things, that its errors were (1) using an annual rate applied as a one-time deduction, and (2) that, given the desirability of the facility, the rate the court used was not supported by the evidence.

The court reasoned that it would be less costly to the parties for it to reopen the case than to have the case proceed to appeal and that it would be more efficient to clarify the matter before the anticipated ultimate appeal of the case. The court indicated that the cost of delay to take more evidence before entry of judgment would be slight in comparison to the parties appealing an issue not clarified and not supported by substantial evidence. The court concluded its analysis by stating the following:

> I do not believe that . . . Plaintiffs were at fault for failing to recognize that the turnover rate would become a pivotal issue from [Good Samaritan's] point of view. [Good Samaritan] has possession of the documents that are relevant for determining turnover rate, and . . . the damages issues and the post-trial distribution issue cannot be easily separated. The turnover rate can be viewed, in part, as a distribution

23

issue. Finally, New Mexico [c]ourts have recognized that there are certain cases for which it is proper for the court to reopen the evidence for the limited purpose of receiving additional information on a discrete topic. *Cienfuegos v. Pacheco*, 56 N.M. 667, 248 P.2d 664 (1952).

At the outset of a hearing in May 2004 on the merits of the turnover rate issue, the court indicated that, throughout the long litigation, it had "made a determination that one of the elements of damage would include the turnover rate" and, further, that the court had made a determination that "the turnover rate [was] a necessary element and not part of the distribution issue" and that "if the turnover rate is not brought forward," the court would be "faced with the unenviable decision of, very possibly, throwing the verdict out."

The court stated in a July 8, 2004, letter to the parties that, based on the evidence that was presented at the hearing, it was modifying the findings of fact to set out "appropriate turnover rates" for each of the years from 1994 through 1999, with the rates varying from as low as 7% in 1998 to as high as 9.98% in 1999. The court's amended findings of fact entered in December 2004 reflect these determinations.

## 2. The Parties' Arguments

Good Samaritan attacks the reopening of the case on several fronts. It argues that Plaintiffs knew that turnover was an issue that Good Samaritan would raise and that Plaintiffs could have produced turnover evidence before the close of the evidence at trial. Good Samaritan further argues that the "deficiency" in Plaintiffs' proof resulted from their tactical decision to treat the case as if the Act governed rates rather than permissible increases in rates and to treat the case as if the class consisted of apartments and not "real individuals." Good Samaritan faults the court for not sticking with "the only turnover rate in the record . . . which [Good Samaritan] demonstrated in post-trial briefing would yield no damages whatsoever if applied in each of the six years of the class period" and for permitting Plaintiffs to cure the deficiency in their proof of any damages. In support of its position, Good Samaritan argues that the court can reopen only if the court determines that the failure of proof did not result from lack of due diligence on the part of Plaintiffs. *See Harrison*, 2000-NMSC-022, ¶ 56 ("Two factors which appellate courts consider in this context are the extent to which the movant used due diligence to obtain the testimony and the probable value of that testimony.").

Plaintiffs essentially respond to Good Samaritan's position by arguing that the court erred in even considering turnover in its damages assessment. Plaintiffs

25

complain that the court's consideration of turnover throughout the proceedings improperly placed the burden of proof on Plaintiffs. They argue that it was proper in the class action to present their claim in the aggregate instead of individualized evidence. They further complain that Good Samaritan never argued at the 2002 trial that turnover should be imposed and did not indicate a specific turnover rate, that Good Samaritan provided no evidence of turnover as to any particular resident, and that the one turnover statistic of 29.8% in evidence before the record was reopened was offered for a purpose other than to measure damages based in part on turnover. Plaintiffs argue that whether they knew of Good Samaritan's arguments regarding turnover was not relevant to the issues of burden of proof and obligations. Thus, Plaintiffs' main counter to Good Samaritan's point is that it was Good Samaritan's burden and obligation to discredit Plaintiffs' damages proof and to show why the damages Plaintiffs proved should be reduced and that Good Samaritan failed to sustain its burden. Plaintiffs cite *First National Bank v. Sanchez*, 112 N.M. 317, 319, 815 P.2d 613, 615 (1991) (holding that a new trial was required due to inadequate proof of damages on which the jury was instructed); *Yates Petroleum Corp. v. Kennedy*, 108 N.M. 564, 566-67, 775 P.2d 1281, 1283-84 (1989) (discussing the parties' burdens of proof relating to damages in an eminent domain proceeding).

However, Plaintiffs also argue that even if they and not Good Samaritan had the burden to show turnover, the court's decision to reopen was within its sound discretion and the decision is not to be lightly overturned. *See Foreman v. Myers*, 79 N.M. 404, 408, 444 P.2d 589, 593 (1968) (stating that our Supreme Court has consistently held that the determination not to reopen a case is within the sound discretion of the district court and will not be lightly overturned); *Riggs v. Gardikas*, 78 N.M. 5, 8, 427 P.2d 890, 893 (1967) (stating that a motion to reopen a case to take additional evidence is addressed to the sound discretion of the district court and our Supreme Court is "always loath to interfere with that discretion").

**3.    Analysis**

There is ample support for the district court's exercise of its discretion to reopen the case for further evidence of turnover rates. The district court determined early on that under the circumstances here, turnover was an integral and critical aspect of damages. The court developed concern about the propriety of its selection of the 29.8% rate and required further evidence on the issue. The court's concern was justifiable, and its explanations for having to reopen the case for further evidence in order to meaningfully evaluate damages were reasonable and sound. We understand Good Samaritan's position that without having provided turnover evidence, Plaintiffs failed in their damages proof and that the court should not have given Plaintiffs any

27

chance, much less a second one, to prove damages by allowing Plaintiffs to offer turnover rate evidence. However, under the circumstances as set out earlier in this opinion, we will not override the court's discretion and determination to reopen and attempt to assure that turnover was thoroughly and adequately considered.

**B.      Asserted Error in Awarding Prejudgment Interest**

After first refusing to award Plaintiffs any prejudgment interest, the court on reconsideration awarded Plaintiffs prejudgment interest under Section 56-8-4(B) from the time of the filing of the complaint to the time of judgment. The court found that it could not attribute delay to either party; however, the court also found that Good Samaritan "did not make reasonable and timely offers to settle with . . . Plaintiffs until long after the trial in this matter."

"The purpose of awarding prejudgment interest under Section 56-8-4(B) is to foster settlement and prevent delay." *Lucero v. Aladdin Beauty Colls., Inc.*, 117 N.M. 269, 272, 871 P.2d 365, 368 (1994). That section "is not . . . limited by whether damages are fixed or ascertainable." *Id.* We review an award of prejudgment interest under Section 56-8-4(B) for abuse of discretion. *See Lucero*, 117 N.M. at 272, 871 P.2d at 368 (stating that the "statute allows the trial court in its discretion to award interest after considering whether the plaintiff caused unreasonable delay and whether the defendant made a reasonable and timely offer of settlement to the plaintiff" and

28

further stating that the Legislature must have intended by the statute "that, to foster timely settlements, a discretionary award of prejudgment interest is allowed in all cases" (internal quotation marks and citation omitted)).

Good Samaritan complains that under the "highly unusual" circumstances in this case the court's award of prejudgment interest from the date of the filing of the complaint was an abuse of discretion. More specifically, Good Samaritan argues abuse of discretion in awarding prejudgment interest where the liability ultimately imposed on it "for its objectively modest fee increases" was unpredictable and was considerably less than what Plaintiffs demanded in damages. Good Samaritan points out that Plaintiffs sought as much as $18 million in damages after trebling, that Plaintiffs' settlement demands began at $6 million by March 2001, dropped to $2.5 million in May 2002, and were at $1.4 million on the eve of trial, and that the court ultimately entered judgment in favor of Plaintiffs for only $122,548; whereas, Good Samaritan notes, it made reasonable offers before trial and on the eve of trial.

Good Samaritan characterizes its settlement offers as follows. In a March 2001 settlement facilitation conducted some eighteen months before trial, Good Samaritan "outlined an approach that would include making capital improvements to [Good Samaritan's] facility and freezing future rent increases to Manzano residents." In a second settlement facilitation in May 2002, Good Samaritan's "opening offer was to

29

spend $1 million for the benefit of residents at the facility on improvements and programs that were negotiable." On the first day of trial, Good Samaritan offered to spend $2 million at its facility for the benefit of residents and to also pay $50,000 in attorney fees.

In support of the court's award of prejudgment interest, Plaintiffs repeat the argument and authority they presented on their own appellate point seeking pre-complaint prejudgment interest suggesting that they have a right to be fully compensated for the damages they suffered from Good Samaritan's wrongful taking and use of their money. In regard to Good Samaritan's settlement offers, Plaintiffs' attorney's affidavit shows that he saw the offers the same as Good Samaritan characterizes them. In specific regard to Good Samaritan's offer on the first day of trial, Plaintiffs show that the $50,000 in attorney fees offered by Good Samaritan was substantially below the amount of costs and attorney fees awarded Plaintiffs, and they argue that Good Samaritan's offer to spend money on the facility was not an offer to pay money to Plaintiffs, but instead would benefit, for example, residents who would reside many years after Plaintiffs lived at the facility and would provide nothing to Plaintiffs who were residents between 1993 and 1999.

Again, we will not override the district court's view of the circumstances and settlement offers. The principal and substantial dollar investment of Good Samaritan

30

was contained in offers that would have only indirect, if any, personal benefit or consequence in regard to Plaintiffs. Good Samaritan's offers appear to be little more than capital investments in its facility that likely would ultimately benefit Good Samaritan's balance sheet and sales and indirectly benefit future residents. The court, in its discretion, could have reasonable determined that Good Samaritan's offers were not reasonable or timely. We cannot say that the court abused its discretion.

**C. Asserted Error in Not Decertifying the Class**

Good Samaritan contends that the class members were never identified by name at any time during the proceedings and that the judgment fails to identify by name the class members who are bound by the judgment and, therefore, the court abused its discretion in refusing to decertify the class. Class certification determinations are reviewed for abuse of discretion. *Enfield v. Old Line Life Ins. Co. of Am.,* 2004-NMCA-115, ¶ 16, 136 N.M. 398, 98 P.3d 1048.

Good Samaritan relies on Rule 1-023(C)(3) NMRA for its position. That rule states that the judgment in an action maintained as a class action under Rule 1-023(B)(3) "shall include and specify or describe those to whom the [required] notice . . . was directed, and who have not requested exclusion, and whom the court finds to be members of the class." Rule 1-023(C)(3). The judgment entered in this case states that "[t]he [c]ourt defined the class as specifically consisting of: 'Residents of

31

Manzano del Sol independent living apartments, during the period from July 30, 1993 to[] July 30, 1999, whose monthly fees were subject to one or more increases during that period.'" The judgment further states that:

> Notice was given to all potential class members and numerous others in addition by the best practicable notice under the circumstances. The Plaintiff Class was notified by registered mail, posted notice at the facility as well as published notice in a paper of general distribution in the Bernalillo County region. The [c]ourt further finds that this notice was reasonably calculated to provide the members of the class actual notice, and was the best practicable notice under the circumstances.

Further, the judgment names the class members who opted out. Other than the foregoing descriptions, the judgment simply refers to the class members as "the Plaintiff Class" and does not identify them by name. The court's amended findings of fact, which are incorporated and adopted by reference in the judgment defines the class as follows: "This is a class action. The plaintiff class has been certified by the [c]ourt's 'Order Granting Certification of Class' filed September 6, 2001[,] and the [c]ourt's [o]rder approving the form of class notice. The class is made up of residents of Manzano de Sol who were subject to fee increases between July 30, 1993 and July 30, 1999."

Good Samaritan argues that under Rule 1-023(C)(3) the judgment was required to specifically identify the members of the class by name and that the judgment is defective because it did not do so. Good Samaritan also argues that the judgment is

defective because it is not clear in the record which of the class members who did not opt out were properly notified and which were not. Good Samaritan blames Plaintiffs for failing to create a record that would have allowed the court to enter judgment in compliance with Rule 1-023(C)(3).

Plaintiffs argue that there exists no authority and show that Good Samaritan cites none holding that decertification is appropriate if a judgment does not name individual class members. They also argue that, under Rule 1-023(C)(3), a description of the class is sufficient and listing class members by name is not required. Plaintiffs assert that the judgment "evidently includes the class members by describing them."

The class specifically described in the judgment is relatively small. Plaintiffs could and should have identified the class members by name and the court should have listed them by name in the judgment. The class was and remains identifiable and it is sufficiently definite to permit Plaintiffs to ascertain individual class members by name. However, although we do not condone these failures, we do not see why the individual class members cannot be individually identified by name as a part of further proceedings on remand without resulting in prejudice to Good Samaritan. It appears that the damages awarded in the judgment are still subject to the distribution process. Thus, we are not convinced that the failure to name class members entitled to distribution of damages requires decertification of the class. Good Samaritan has not

shown why this procedural aspect cannot be accomplished in further proceedings. We are not provided with any persuasive rationale or authority, nor do we see any basis, on which to conclude that the district court abused its discretion in not decertifying the class. We remand for Plaintiffs to ascertain and prove the names of the individual class members entitled to damages and for the court to proceed with any issues related to distribution of the damages awarded.

**CONCLUSION**

We affirm the judgment of the district court in all respects. However, we remand the case to the district court for further proceedings consistent with this opinion in regard to identification by name of individual class members entitled to a distribution of damages and placement of the names of those members in an amended judgment.

**IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**
**WE CONCUR:**

_____
**CYNTHIA A. FRY, Chief Judge**

_____
**CELIA FOY CASTILLO, Judge**