This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**LINDA MICHELLE McNALLEN,**

    Petitioner-Appellee,

v.                                                                                                    **NO. 29,670**

**MICHAEL RICHARD McNALLEN,**

    Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF CHAVES COUNTY**
**Freddie J. Romero, District Judge**

Caren I. Friedman
Santa Fe, NM

Kraft & Hunter, LLP
Dustin K. Hunter
Roswell, NM

for Appellee

Michael R. McNallen
Midland, Tx

Pro se Appellant

**MEMORANDUM OPINION**

**CASTILLO, Chief Judge.**

Husband appeals from a final decree of dissolution of marriage, contending that his attorney did not have authority to agree to terms of settlement and that the district court erred in finding that a meeting of the minds had occurred between the parties. We affirm.

**I.     BACKGROUND**

In 2007, after 19 years of marriage, wife filed a petition for dissolution of marriage. Because Wife home-schooled the couple's two children and did not work and because Husband controlled the couple's business that was started and incorporated during the marriage, Husband was ordered to pay support for Wife and for Children during the course of the divorce proceedings. In May 2008, the district court found Husband to be more than $26,000 in arrears in monthly payments. Husband was also refusing to pay the mortgage on the community residence. Both parties filed cross motions regarding the level of support and payments, and Wife filed a motion to compel discovery of documents related to the business. The district court set those motions aside in August 2008 when it was presented with a settlement

agreement negotiated by the parties.

The key events center around the settlement conference on August 9, 2008, and a hearing before the district court two days later. Husband did not attend the settlement conference, though he was in contact with his attorney by phone. Husband contends that his attorney had authority only to discuss "avenues for possible compromise or resolution" but did not have authority to agree to a settlement. Wife points out that Husband's counsel announced his settlement authority in an e-mail that initiated the settlement conference and that Husband's counsel spoke to Husband by phone during the meeting and announced afterward to Wife and her counsel, "We have a deal." At the hearing in court two days later memorializing the agreement, Husband's attorney confirmed that a deal had been reached, despite minor modifications that were needed to the agreement. Husband sat by his attorney's side throughout the hearing, making no comments. The district court announced, "Well, it sounds like the parties do have an agreement," and ordered the parties to "prepare the appropriate paperwork" for the final decree.

Husband contends that after the hearing, Wife's attorney presented him with a form of the agreement that had been signed two days earlier by Wife and the parties' two attorneys, but Husband would not sign it. Wife argues that there is no evidence that this occurred. Regardless of whether this transpired, the court was unaware of it.

Consequently, the court relied on the conduct of the parties, specifically on Husband's silence to the explanation of the terms.

Over the course of the next month, the parties exchanged e-mails and drafts of the final agreement. On September 8, 2008, Husband's attorney filed a motion to withdraw, which the district court granted. At a September 29, 2008 hearing on Wife's motion for presentment, Husband, appearing pro se, denied that a deal had been reached or that he had assented to the events of August 9 and 11. The district court gave Husband a few days to review the transcript of the August 11 hearing in order to attest to its accuracy. Husband agreed that the transcript was an accurate rendering of the hearing. On October 16, 2008, the district court ruled that Husband was bound by the terms of the settlement agreement, and a presentment hearing was set for November 10. At the November 10 hearing, Husband, again appearing pro se, continued to insist that he should not be bound by the settlement agreement, and the district court granted Husband's motion opposing the October 16 order. The court declared that "we go back to square one," ordered all community assets seized and placed in trust, and gave Husband 10 days to comply with Wife's discovery requests. However, two days later, the district court reversed itself and informed the parties that it had "acted improvidently." On Husband's motion, the judge recused a week later. With a new judge in place, the district court held a hearing March 4, 2009, on all

4

pending motions in the case. On April 30, 2009, the district court issued a letter ruling affirming the October 16 order calling for a final decree. On May 21, 2009, the district court entered the final decree of dissolution of marriage that included the elements agreed to at the August settlement conference and also ordered Husband to pay child support that was in arrears.

**II.    DISCUSSION**

Husband makes three arguments on appeal, all somewhat intertwined. First, he argues that his attorney did not have settlement authority at the August 9, 2008 meeting, and thus was not authorized to sign the document and present it to the district court two days later. Second, he argues that the district court erred in finding that the parties had reached a meeting of the minds and that the agreement was a binding contract. Third, Husband contends that the second judge in the case, appointed after the first judge's recusal, abused his discretion by (1) adopting the findings and conclusions of the first judge, (2) ruling that Husband was bound by the terms of the settlement agreement, and (3) entering the final decree of dissolution of marriage. We address those arguments in turn. We also address Wife's request for attorney's fees for this appeal.

**A.    The District Court's Finding of an Agreement Between the Parties**

**1.    Husband's Attorney Was Held Out as Having the Authority to Represent Husband**

Husband argues that the district court incorrectly ruled that his attorney had the authority to enter into a settlement agreement that Husband had not signed off on. Wife presented evidence below that Husband cloaked his attorney with the authority to execute the settlement agreement.

In New Mexico, an attorney representing a client has authority "to bind his client to any agreement in respect to any proceeding within the scope of his proper duties and power." NMSA 1978, § 36-2-11(B) (1909). "Certain courts have recognized a public policy argument for enforcing settlement agreements entered into by attorneys clothed with apparent authority to settle an action." *Navajo Tribe of Indians v. Hanosh Chevrolet-Buick, Inc.*, 106 N.M. 705, 707, 749 P.2d 90, 92 (1988). "While an attorney's authority to settle must be expressly conferred, it is presumed that an attorney of record who settles his client's claim in open court has authority to do so unless rebutted by affirmative evidence to the contrary." *Id.* (citation omitted). For such a factual determination, we review the district court's finding that Husband's attorney had settlement authority under a substantial evidence standard. *See Augustus v. John Williams & Assocs., Inc.*, 92 N.M. 437, 440, 589 P.2d 1028, 1031 (1979) (using the substantial evidence standard to determine whether an attorney had the authority to enter into an enforceable settlement agreement). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a

6

conclusion." *Landavazo v. Sanchez*, 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990). In reviewing a claim for substantial evidence, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of Las Cruces*, 1997-NMCA-044, ¶ 12, 123 N.M. 329, 940 P.2d 177. "Unless clearly erroneous or deficient, findings of the trial court will be construed so as to uphold a judgment rather than to reverse it." *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 25, 146 N.M. 473, 212 P.3d 361.

Our Supreme Court has set forth the "basic principles of law applicable to the authority of attorneys to settle cases": (1) the party seeking judgment has the burden of establishing the assent of the other party, (2) merely employing an attorney does not give that attorney implied or apparent authority to settle a cause of action, (3) an attorney may act without consulting the client in an emergency situation when the client's interests are at stake, (4) a client must be "clear and unequivocal" in giving the attorney authority, and (5) any unauthorized settlement by an attorney may be repudiated by the client. *Augustus*, 92 N.M. at 438-39, 589 P.2d at 1029-30 (internal quotation marks and citation omitted). Clothing an attorney with settlement authority need not be express. *See Diversified Dev. & Inv., Inc. v. Heil*, 119 N.M. 290, 296, 889 P.2d 1212, 1218 (1995) (stating that "[a]pparent authority arises from manifestations

by the principal to the third party"). It is true, as Husband points out, that "the mere employment of an attorney does not of itself give the attorney the implied or apparent authority to compromise his client's cause of action." *Augustus*, 92 N.M. at 439, 589 P.2d at 1030. Husband also notes that an attorney "does not, merely by representing his client in settlement negotiations, become vested with apparent or implied authority to settle the client's case." Husband characterizes the situation by arguing that he was out of town when the "impromptu" settlement meeting took place for the "possibility of resolving the matter" and that he "may have had" knowledge, via two phone calls, about what occurred at the meeting.

Husband understates the circumstances surrounding the August 9, 2008 settlement conference that included his attorney, Wife, and her attorney. In fact, on August 6, 2008, Husband's attorney sent an e-mail to Wife's attorney proposing the settlement conference. He wrote:

> I asked [Husband] to forward the most recent e-mail correspondence regarding settlement discussions so we will all be on the same page. [Husband] will be out of town for the next few days but will be available by phone to resolve any issues. He has given me settlement authority to meet with you and your client to resolve this case.

Wife later testified, when asked by her own attorney at a September 29, 2008 hearing whether Husband's attorney had settlement authority at the August meeting: "He did. He stated that he had authority since [Husband] couldn't be there and that he would

8

have telephone contact with him throughout the . . . meeting." Wife, in unrebutted testimony, stated that after an agreement was reached by the three attendees at the meeting, she and her attorney left Husband's attorney alone in the conference room to phone Husband: "[H]e was making the phone call as we left. We were sitting in [Wife's attorney's] office. [Husband's attorney] walked into [the] office and said, 'We have a deal.'"

Notably, for the next month, Husband did not repudiate his attorney's actions at the meeting or the resulting agreement on the major terms of the settlement deal. The parties, including Husband, went before the district court two days after the settlement conference, with wife's attorney telling the court that a "global resolution" had been reached and Husband's attorney noting "a few minor modifications" that were needed but adding, "I am sure me and counsel will agree as to the final form of the language." Husband sat at his attorney's side during the hearing and did not speak. At the end of the hearing, the judge stated, "Well, it sounds like the parties do have an agreement." He ordered the drafting of a settlement agreement and then addressed Husband and Wife by stating: "Mr. and Mrs. McNallen, you both have competent counsel to represent you. Take their advice in regard to these matters, but certainly be sure that both of you understand all of your rights and responsibilities as set forth in the marital settlement agreement and the parenting plan." Neither party

9

spoke in response.

At no time on August 9 or August 11, 2008 did husband object to the agreement or give any indication that his attorney acted beyond his authority in negotiating the agreement between the parties. For the next four weeks, e-mails were exchanged among all four principals as various drafts of the settlement agreement were shared. The parties agreed to a parenting plan that established a child support payment of $957.02 per month from Husband to Wife. On September 4, 2008, Husband sent an e-mail addressing the three other principals, directing this statement to his own attorney: "Gabriel: Thank you for your help."

Husband's actions during the month-long settlement negotiations and finalization of the agreement can be distinguished from a case he relies on, *Augustus*. In *Augustus*, the attorney for the complaining party "testified that he had no authority to enter into a final settlement agreement nor to approve the judgment without his client's consent." 92 N.M. at 439, 589 P.2d at 1030. The attorney also testified that his clients had not seen the proposed settlement or approved it. *See id.* at 440, 589 P.2d at 1031. The Court also found that "an essential element" was missing from the proposed agreement. *Id.* In the case before us, Husband's behavioral manifestations between August 9 and September 8, 2008 were consistent with a client clothing his attorney with settlement authority. *See Diversified Dev. & Inv., Inc.*, 119 N.M. at 296,

10

889 P.2d at 1218. He presented no evidence to the district court to show that his attorney did not have settlement authority. On the contrary, substantial evidence before the district court, including the events of August 9 and 11 and the follow-up e-mail exchanges presented later to the court, gave every indication that Husband approved of the actions of his attorney.

When later proceeding pro se before the district court, Husband argued that he had not given his attorney authority to agree to a settlement. He makes the same argument on appeal, but without adequate citations to the record. We defer to the district court in judging the credibility of the witnesses during the proceedings. In conducting a review based on substantial evidence, "[i]t is for the trial court to weigh the testimony, determine the credibility of witnesses, reconcile inconsistent statements[,] and determine where the truth lies." *Lopez v. Adams*, 116 N.M. 757, 758, 867 P.2d 427, 428 (Ct. App. 1993). As in *Navajo Tribe*, Husband "held [his] attorney out to opposing counsel and to the court as having authority to settle." 106 N.M. at 707, 749 P.2d at 92. We conclude that the district court's implicit finding that Husband's attorney had settlement authority is based on substantial evidence and that Wife met the burden of showing that Husband—through his actions before, during, and after the settlement conference—was clear and unequivocal in holding out his attorney as having that authority.

## 2. The Two Parties Came to a Meeting of the Minds

Husband also argues that no valid contract exists and the parties never came to a meeting of the minds because (1) he did not approve of the results of the August 9, 2008 settlement conference; (2) he did not sign the agreement; and (3) he was not asked to signify his assent at the court hearing two days later. The district court concluded that an agreement had been reached and a contract formed.

> The question of interpretation of language and conduct (the question of the meaning to be given the words of the contract) is a question of fact where that meaning depends on reasonable but conflicting inferences to be drawn from events occurring or circumstances existing before, during, or after negotiation of the contract.

*C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 509, 817 P.2d 238, 243 (1991). We use the same standard as in the above issue and review for substantial evidence. *See Trujillo v. Glen Falls Ins. Co.*, 88 N.M. 279, 281, 540 P.2d 209, 211 (1975) (using the substantial evidence standard to determine whether a meeting of the minds occurred during a settlement agreement); *Garcia v. Garcia*, 2010-NMCA-014, ¶ 17, 147 N.M. 652, 227 P.3d 621 (stating in a case involving an attempt to enforce a marital settlement agreement that "[w]e review district court determinations for substantial evidence"); *City of Sunland Park v. Harris News, Inc.*, 2005-NMCA-128, ¶ 31, 138 N.M. 588, 124 P.3d 566 (using the substantial evidence standard to determine whether a meeting of the minds occurred during a settlement agreement);

12

*Romero v. Bank of the Southwest*, 2003-NMCA-124, ¶ 18, 135 N.M. 1, 83 P.3d 288 (using substantial evidence review to address the question of whether a contract was ratified). That standard is proper to address the question of whether an oral agreement between two parties may be enforced. *See Augustus*, 92 N.M. at 440, 589 P.2d at 1031. To the extent we must determine any questions of law, we do so de novo. *See Styka v. Styka*, 1999-NMCA-002, ¶ 8, 126 N.M. 515, 972 P.2d 16.

Initially, Husband argues that the statute of frauds bars enforcement of the contract because he never signed the settlement agreement. We disagree. A contract that is subject to the statute of frauds and is not signed may otherwise be enforceable if the party against whom enforcement is sought agreed to its terms, including an oral marital settlement agreement that has been reduced to writing. *See* NMSA 1978, § 55-2-201(3) (1961); *Herrera v. Herrera*, 1999-NMCA-034, ¶¶ 16-17, 126 N.M. 705, 974 P.2d 675. We have also stated that

> [t]he purpose of the statute of frauds is to prevent fraud and perjury. It is not to prevent the performance or the enforcement of oral contracts that have in fact been made or to create a loophole of escape for one who seeks to repudiate an agreement that he admits was made.

*Herrera*, 1999-NMCA-034, ¶ 13 (alteration, internal quotation marks, and citations omitted). In *Herrera*, we noted that testimony showed that the husband understood and agreed to the terms of the marital settlement agreement. *Id.* ¶ 16. "What does prove the existence and therefore enforceability of the [marital settlement agreement]

is the testimony given to the [district] court." *Id.* ¶ 13. We therefore look to the evidence presented to the court below to determine whether the court properly concluded that a meeting of the minds existed and a valid agreement was reached.

We proceed by first noting that "[i]t is the policy of the law and of the State of New Mexico to favor settlement agreements." *Navajo Tribe*, 106 N.M. at 707, 749 P.2d at 92. It follows that a party seeking relief from a settlement "has a heavy burden of persuasion." *Marrujo v. Chavez*, 77 N.M. 595, 599, 426 P.2d 199, 201 (1967). We assess whether substantial evidence supported the district court's finding that a valid settlement agreement was reached by the parties. In doing so, we rely on some of the same events described above in Section 1.

The actions of August 2008 are consistent with the manifestations of two parties reaching a meeting of the minds. After months of wrangling between the parties and various motions pending before the court, Husband's attorney instigated a settlement conference with an August 6, 2008 e-mail to Wife's attorney that included "recent e-mail correspondence regarding settlement discussions so we will all be on the same page." Wife testified that Husband's attorney called the meeting because he and his client were "ready to talk to reach a final settlement." Although Husband did not attend the August 9, 2008 conference, he participated intermittently by phone. Toward the end of the conference, when an oral agreement had been reached,

14

Husband's attorney called Husband and after speaking to him announced to Wife and her attorney, "We have a deal." The three principals then signed the agreement. Later that day, Husband's attorney sent an e-mail requesting a copy of the "settlement agreement," intending to forward it to Husband. Two days later the agreement was read in open court. Wife's attorney told the court that a "global resolution" had been reached with all major terms agreed on. The major terms involved the splitting of the business and house; a cash equalization payment from Husband to Wife; a payoff of the mortgage by Husband; the provision of child support and health care for the children; the settling of tax liabilities; and a parenting plan. With Husband at his side, Husband's attorney concurred in the announcement of a settlement aside from "a few minor modifications," assuring the judge that "I am sure me and [Wife's] counsel will agree as to the final form of the language." We note that failure to agree on minor portions of an agreement are not fatal as long as the agreement includes the essential terms agreed to. *See Restatement (Second) of Contracts* § 131 cmt. g (1981) ("The 'essential' terms of unperformed promises must be stated; 'details or particulars' need not. What is essential depends on the agreement and its context and also on the subsequent conduct of the parties[.]"). Moreover, Husband's attorney's use of the word "minor" to describe future modifications appears to preclude any argument that the unspecified remaining details were "essential."

In addition, Husband did not speak or otherwise object to the proceedings, and at the end of the presentation, the judge stated, "Well, it sounds like the parties do have an agreement." The court then addressed Wife and Husband about the ways in which to carry out the agreement, including the parenting plan. The court did not directly ask Husband or Wife if they agreed to the settlement. Husband later suggested to the court that his silence at the August 11 settlement hearing signified his objection to the agreement. He provides no legal support for this contention. Normally silence in these circumstances signifies agreement or assent to the proceedings. *See State v. Singleton*, 2001-NMCA-054, ¶ 14, 130 N.M. 583, 28 P.3d 1124 ("An attorney's tactical decision is particularly accepted when the defendant is present, aware of the circumstances, and remains silent.").

At no time during the next few weeks following the court hearing did Husband express opposition to any of the major terms of the agreement; rather, he and his attorney pursued the following concerns that had been expressed to the district court: that calculations for Husband's child support payments would be based on his personal gross income of $125,000 per year; that Husband agreed to indemnify wife for tax liabilities but not to defend her; that Wife would have no claim to Husband's future assets; and that Husband would pay no spousal support or attorney's fees to Wife. Both Husband's attorney and Husband, in their e-mails to Wife and her

16

attorney, referred to the "settlement agreement[.]" Husband's attorney at one point stated, "You appear to have incorporated all of the changes we discussed." During this back and forth, in an e-mail to the three principals, Husband addressed his attorney by saying "Thank you for your help." At a subsequent hearing before the court, when the court twice asked him "What is it that you object to" in the agreement? Husband—at this point proceeding pro se—gave no specifics about the major terms of the agreement. Instead, Husband downplayed the significance of the issues to be resolved; he rejected the court's offer for time to hire another attorney and told the court that "there's really not much to this [settlement]"; that finalizing the process was "just a simple matter"; and that "having counsel would just be irrelevant." Husband added, "There's not a huge matter that needs to be litigated, frankly."

While Husband continues to argue that no agreement was ever reached between the parties, the overwhelming evidence presented to the district court showed that a meeting of the minds occurred at the settlement conference arranged by Husband's lawyer. We disagree with his contention that "there were . . . undetermined settlement terms" hanging before the court at the time of its decision. Even the minor issues were apparently resolved, except for the question of tax liability, and on that point the court found that Husband agreed, at a minimum, to indemnify Wife but not to defend her. At the hearing two days after the settlement conference and in the e-mail

17

exchanges for a month afterward Husband never disputed the major terms of the agreement or repudiated the actions of his lawyer or the basic settlement that had been reached. He personally e-mailed to Wife and her attorney copies of drafts of the agreement that included his suggested changes but none that sought to alter a major term. We conclude that substantial evidence exists for the district court to have decided on October 16, 2008, that a global resolution had been reached between the parties, resulting in an enforceable marital settlement agreement.

**3. Second Judge Did Not Abuse His Discretion in Adopting the First Judge's Ruling**

Finally, Husband contends that the second judge in the case abused his discretion by adopting the findings and conclusions of the previous judge. "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996-NMSC-078, ¶ 65, 122 N.M. 618, 930 P.2d 153. When reasons both supporting and detracting from a decision exist, there is no abuse of discretion. *Talley v. Talley*, 115 N.M. 89, 92, 847 P.2d 323, 326 (Ct. App. 1993).

Husband points to "undetermined settlement terms" that should have alerted the second judge to the need for more fact-finding before proceeding to a final decree. Husband claims that the second judge should have taken more testimony and inquired further into "the parties' intent and understanding of the purported settlement

18

agreement." Husband accuses the first judge of "waffling back and forth" by dismissing his October 16, 2008 order at a November 10 hearing only to reverse that decision two days later and reinstate the order; Husband suggests that the judge "had difficulty determining whether an agreement had been reached." We evaluate the first judge's actions differently. While the first judge originally granted Husband's motion to dismiss the October order, he changed his mind two days later. We believe that this behavior does not show the court's difficulty in deciding the case, but rather exhibits the court's initial frustration with a pro se party trying to undo a deal followed by a conclusion that a settlement was in fact reached. This is illustrated by the judge's preface to the original ruling on November 10 when he told Husband, "[B]e careful what you wish for." In his letter of November 12, the judge explained that "[u]pon reflection, I am of the view that I acted improvidently on November 10," and then the court reaffirmed the October order. The court then recused a week later on Husband's motion.

Husband also suggests that the second judge followed this disruption to the proceedings by merely rubber-stamping the decision of a flip-flopping colleague. We disagree. The second judge on March 4, 2009 conducted a 48-minute hearing on all outstanding motions and again entertained Husband's arguments that a settlement agreement had not been reached. The second judge methodically addressed the issues

19

before the court and allowed husband an opportunity to air his concerns. The judge specifically addressed the question of whether a meeting of the minds had taken place and whether the agreement was valid. In our review of the second judge's actions, we see no behavior on his part that "is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims*, 1996-NMSC-078, ¶ 65. Rather, the second judge took a sober look at the preceding events and court proceedings and heard extended arguments from both sides. We conclude that the second judge did not abuse his discretion in adopting the findings and conclusions of the first judge, affirming the order of October 16, 2008, and proceeding to a final decree in the case.

**B.      Attorney Fees**

Wife requests attorney fees for having to defend against this appeal. Husband did not file a reply brief and respond to that request. Wife argues that Husband makes frivolous arguments regarding the settlement authority of his attorney and the extent of his agreement with the settlement terms. Wife also contends that Husband has long sought to make good on a threat to prolong the litigation in order to drain the community assets, including an attempt to extend the proceedings through this appeal. Husband also has frequently fallen behind on support payments and has failed to execute a quit-claim deed on the marital residence, as ordered by the court.

New Mexico follows the "American rule" regarding attorney fees, which holds that, "absent statutory or other authority, litigants are responsible for their own attorney[] fees." *New Mexico Right to Choose/NARAL v. Johnson*, 1999-NMSC-028, ¶ 9, 127 N.M. 654, 986 P.2d 450 (internal quotation marks and citation omitted). Under that rule, attorney fees may be awarded pursuant to a statute, a court rule, or by contractual agreement. *Id.* Courts may consider "limited, narrow exceptions" to this rule. *Id.* ¶ 15. "A court may award attorney[] fees in order to vindicate its judicial authority and compensate the prevailing party for expenses incurred as a result of frivolous or vexatious litigation." *State ex rel. N.M. State Highway & Transp. Dep't v. Baca*, 120 N.M. 1, 5, 896 P.2d 1148, 1152 (1995). "New Mexico law permits the award of attorney fees on appeal in domestic relation cases." *Rhinehart v. Nowlin*, 111 N.M. 319, 330, 805 P.2d 88, 99 (Ct. App. 1990).

In the case before us, statutory authority exists for the award of attorney fees. *See* NMSA 1978, § 40-4-7(A) (1997) ("The court may make an order, relative to the expenses of the proceeding, as will ensure either party an efficient preparation and presentation of his case."); *Garcia v. Jeantette*, 2004-NMCA-004, ¶ 19, 134 N.M. 776, 82 P.3d 947 (stating that "the central purpose of an award of attorney fees under Section 40-4-7(A) is to remedy any financial disparity between the divorcing parties so that each may make an efficient and effective presentation of his or her claims in

21

the underlying divorce case"); *Alverson v. Harris*, 1997-NMCA-024, ¶ 26, 123 N.M. 153, 935 P.2d 1165 ("The most important factor the [district] court considers in deciding whether to award attorney fees is economic disparity between the parties." (internal quotation marks and citation omitted)). In *Herrera*, attorney fees were awarded when a husband's refusal to sign a marital settlement agreement led to delays, including the filing of an appeal. 1999-NMCA-034, ¶¶ 19-20. We conclude that Wife is entitled to attorney's fees for the costs associated with Husband's appeal.

Because Wife prevails on appeal, we remand her request for attorney fees to the district court to determine, in its discretion, the amount Wife is entitled to for the attorney fees she incurred in this appeal. We do this because fact-intensive factors inform the determination, such as the economic disparity between the parties' resources, the needs of the parties and their ability to pay, prior settlement offers, the total amount of fees expended by each party, and any balances due by Husband. *See* Rule 12-403 NMRA.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the court below and remand for consideration of attorney fees related to this appeal.

**IT IS SO ORDERED.**

_____
**CELIA FOY CASTILLO, Chief Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**J. MILES HANISEE, Judge**